JULIA NEWMAN v. F. W. BOST, Administrator of J. F. VanPelt.

(Decided April 19, 1898).

## *Donatio Causa Mortis—Delivery—Constructive Delivery—Symbolical Delivery—Gifts Inter Vivos.*

1. To constitute a gift *inter vivos* or *causa mortis* there must be a clear intention to make the gift and a delivery of possession. Such intention need not be announced by the donor in express terms but may be inferred from what he said or did at the time of the delivery.

2. Where the articles are present and are capable of actual manual delivery such delivery must be made in order to constitute a gift *inter vivos* or *causa mortis* ; but where the intention of the donor to make the gift plainly appears and the articles intended to be given are not present, or, if present, are incapable of manual delivery, effect will be given to a *constructive* delivery.

3. A *donatio causa mortis* requires but one witness and no publicity need be given to it; neither is probate or registration required.

4. Where a donor in his last illness delivered to the donee the keys to a bureau in the room saying : "What property is in this house is yours"; *Held*, that it was a constructive delivery of the bureau but not of a policy of life insurance in a drawer of the bureau, since the policy was capable of manual delivery.

5. Where the circumstances and declarations of the donor showed his intention to give the property in his house to a donee to whom he gave the keys saying: "What property is in this house is yours"; *Held*, that it was a constructive delivery of all furniture locked or unlocked by the keys but not of other furniture in the house.

6. Where a donor bought and placed furniture in donee's bed chamber, over which the latter had control, and the intention to make the gift was shown by uncontradicted testimony; *Held*, that such facts were sufficient to justify a jury in finding that there was a gift and delivery *inter vivos*.

7. Where P bought a piano and placed it in his parlor over which he had control, called it "Miss Julia's piano," but insured it in his own name and collected the insurance money which he retained saying he intended to buy another piano for her but never did so; *Held*, that such facts were insufficient to constitute a gift and delivery so as to enable the alleged donee to recover the amount of the insurance money from P's administrator.

8. Symbolical delivery of gifts either *inter vivos* or *causa mortis* is not re-
   cognized in this State.

CIVIL ACTION tried before *Coble, J.*, and a jury at
Fall Term, 1897, of IREDELL Superior Court.

The plaintiff alleged in her complaint that the intes-
tate of defendant, while in his last sickness, gave her
all the furniture and other property in his dwelling
house as a gift *causa mortis*. Among other things
claimed, there was a policy of insurance of $3,000 on
the life of intestate and other valuable papers, which
she alleged were in a certain bureau drawer in intes-
tate's bed room. She alleged that defendant adminis-
trator has collected the policy of life insurance and sold
the household and kitchen furniture, and this suit is
against *defendant as administrator* to recover the value
of the property alleged to have been converted by him.
There are other matters involved, claims for services,
claim for fire insurance collected by intestate in his life
time, etc.

On the trial it appeared that the intestate's wife died
about 10 years before he died and without issue ; that
the intestate lived in his dwelling after his wife's death
in Statesville until his death and died without issue ;
that about the last day of March, 1896, he was stricken
with paralysis and was confined to his bed in his house
and was never able to be out again till he died on the
12th day of April, 1896; that shortly after he was strick-
en he sent for Enos Houston to nurse him in his last ill-
ness; that while helpless in his bed soon after his con-
finement and *in extremis* he told Houston he had to go
—could not stay here—and asked Houston to call plain-
tiff into his room ; he then asked the plaintiff to hand
him his private keys, which plaintiff did, she having

gotten them from a place over the mantel in intestate's bedroom in his presence and by his direction ; he then handed plaintiff the bunch of keys and told her to take them and keep them, that he desired her to have them and everything in the house ; he then pointed out the bureau, the clock, and other articles of furniture in the house and asked his chamber door to be opened and pointed in the direction of the hall and other rooms and repeated that everything in the house was hers—he wanted her to have everything in the house ; his voice failed him soon after the delivery of the keys and these declarations, so that he could never talk again to be understood except to indicate yes and no, and this generally by a motion of the head; the bunch of keys delivered to the plaintiff, amongst others, included one which unlocked the bureau pointed out to plaintiff as hers (and other furniture in the room), and the bureau drawer, which this key unlocked, contained in it a life insurance policy payable to intestate's estate and a few small notes, a large number of papers, receipts, etc., etc., and there was no other key that unlocked this bureau drawer, this bureau drawer was the place where intestate kept all his valuable papers; plaintiff kept the keys as directed from time given her and still has them ; at the death of intestate's wife he employed plaintiff, then an orphan about eighteen years old, to become his housekeeper, and she remained in his service for ten years and till his death, and occupied rooms assigned her in intestate's residence; in 1895 the intestate declared his purpose to marry plaintiff within twelve months; nobody resided in the house with them; immediately after the death of intestate, Houston told of the donation to Mr. Burke and the plaintiff informed her attorney, Mr Burke, of it, and she made known her claim to the property in the

house and kept the keys and forbid the defendant from interfering with it in any way, both before and after he qualified as administrator.

Other facts in relation to the plaintiff's claim appear in the opinion. There was a verdict, followed by judgment for the plaintiff and defendant appealed.

*Messrs. Long & Long* and *H. Burke* for plaintiff.
*Messrs. Armfield & Turner, Mr. J. A. Hartness* and *Mr. H. P. Grier* for defendant (appellant).

FURCHES, J.: The plaintiff in her complaint demands $3,000 collected by defendant, as the administrator of J. F. Van Pelt on a life insurance policy, and now in his hands ; $300, the value of a piano upon which said Van Pelt collected that amount of insurance money ; $200.94, the value of household property sold by defendant as belonging to the estate of his intestate, and $45 the value of property in the plaintiff's bed room and sold by the defendant as a part of the property belonging to the intestate's estate.

The $3,000 money collected on the life insurance policy and the $200.94, the price for which the household property sold, plaintiff claims belonged to her by reason of a *donatio causa mortis* from said Van Pelt. The $45, the price for which her bed room property sold, and the $300 insurance money on the piano, belonged to her also by reason of gifts *inter vivos*.

The rules of law governing all of these claims of the plaintiff are in many respects the same, and the discussion of one will be to a considerable extent a discussion of all.

To constitute a *donatio causa mortis*, two things are indispensably necessary : an intention to make the gift

and a delivery of the thing given. Without both of these requisites, there can be no gift *causa mortis.* And both these are matters of fact to be determined by the jury, where there is evidence tending to prove them.

The intention to make the gift need not be announced by the donor in express terms, but may be inferred from the facts attending the delivery, that is, what the donor said and did. But it must always clearly appear that he knew *what he was doing,* and that he intended a gift. So far, there was but little diversity of authority, if any.

As to what constitutes or may constitute delivery, has been the subject of discussion and adjudication in most or all the courts of the Union and of England, and they have by no means been uniform,—some of them holding that a symbolical delivery, that is, some other article delivered in the name and stead of the thing intended to be given, is sufficient; others holding that a symbolical delivery is not sufficient, but that a constructive delivery, that is, the delivery of a key to a locked house, trunk, or other receptacle, is sufficient. They distinguish this from a symbolical delivery, and say that this is in *substance* a delivery of the *thing,* as it is the means of using and enjoying the thing given ; while others hold that there must be an actual manual delivery to perfect a gift *causa mortis.*

This doctrine of *donatio causa mortis* was borrowed from the Roman Civil Law by our English ancestors. There was much greater need for such a law at the time it was incorporated into the civil law and into the English law than there is now. Learning was not so general, nor the facilities for making wills so great, then as now. But the civilians, while they incorporated this doctrine into their law, did not do so without guarding

it with great care. They required that a *donatio causa mortis* should be established by at least five witnesses to the facts constituting the gift. And why it was that our English ancestors should have adopted the doctrine, without also adopting the manner in which it should be proved, seems to be unexplained. But they did so, and only required the facts to be proved by one witness, as in this case.

It seems to us that there was greater reason in England, as there is here, for requiring it to be established by five witnesses, than in Rome, after the Statute of Frauds and of Wills, as this doctrine of *causa mortis* is in direct conflict with the spirit and purpose of those statutes—the prevention of fraud. It is a doctrine, in our opinion, not to be extended but to be stricly construed and confined within the bounds of our adjudged cases. We were at first disposed to confine it to cases of actual *manual* delivery, and are only prevented from doing so by our loyalty to our own adjudications. But it is apparent from the adjudications that our predecessors felt the restrictions of former adjudications, and that they were not disposed to extend the doctrine.

We will not go into the general review of the many cases cited in the well considered briefs filed in the case on both sides. Were we to do this, it would lead us into a labyrinth of discussion without profit, as we would not feel bound by the decisions of other jurisdictions, and would put our own construction on the doctrine of *donatio causa mortis*, but for decisions of our own State. Many of the cases cited by the plaintiff are distinguishable from ours, if not all of them. The case of *Thomas* v. *Lewis* (a Virginia case) 37 Am. St. Reports 878, was probably more relied on by the plaintiff than

122—34

any other case cited, and for that reason we mention it by name. This case, in its essential facts, is distinguishable from the case under consideration. There, the articles present were taken out of the bureau drawer, handed to the donor, and then delivered by him to the donee. According to all the authorities, this was a good gift *causa mortis*. The box and safe, the key to which the donor delivered to the donee, were not present but were deposited in the vault of the bank ; and so far as shown by the case it will be presumed, from the place where they were and the purpose for which things are usually deposited in a bank vault, that they were only valuable as a depository for such purposes, as holding and preserving money and valuable papers, bonds, stocks and the like. This box and safe would have been of little value to the donee for any other purpose. But more than this, the donor expressly stated that all you 'find *in this box and this safe is yours*. There is no mistake that it was the intention of the donor to give what was contained in the box and in the safe.

As my Lord Coke would say, "Note the diversity" between that case and the case at bar. There, the evidences of debt contained in the bureau which was present, were taken out, given to the donor, and by him delivered to the donee. This was an actual manual delivery, good under all the authorities. But no such thing was done in this case as to the life insurance policy. It was neither taken out of the drawer nor mentioned by the donor, unless it is included in the testimony of Enos Houston who, at one time, in giving in his testimony says that Van Pelt gave her the keys, saying "what is in this house is yours," and at another time on cross examination, he said to Julia, "I intend to give you this furniture in this house", and at another time, "What

property is in this house is yours." The bureau in which was found the life insurance policy, after the death of Van Pelt, was present in the room where the keys were handed to Julia, and the life insurance policy could easily have been taken out and handed to Van Pelt, and by him delivered to Julia, as was done in the case of *Thomas* v. *Lewis*, *supra*. But this was not done. The safe and box, in *Thomas* v. *Lewis*, were not present, so that the contents could not have been taken out and delivered to the donee by the donor. The ordinary use of a stand of bureaus is not for the purpose of holding and securing such things as a life insurance policy, though they may be often used for that purpose, while a safe and a box deposited in the vault of a bank are. A bureau is an article of household furniture, used for domestic purposes, and generally belongs to the ladies' department of the household government, while the safe and box, in *Thomas* v. *Lewis*, are not. The bureau itself, mentioned in this case, was such property as would be valuable to the plaintiff.

We have very carefully compared the case of *Thomas* v. *Lewis* and this case for the purpose of noting the distinction between them, and, as we have already said, we have taken this case, since it was pressed upon our attention in the brief of the plaintiff's counsel, as being more nearly like the case at bar than any other cited, and as it was impossible for us to give a separate consideration to all of them.

It is held that the law of delivery in this State is the same in gifts *inter vivos* and *causa mortis*. *Adams* v. *Hayes*, 24 N. C., 361. And there are expressions used by Judge Gaston in the argument that would justify us in holding that, in all cases of gifts, whether *inter vivos* or *causa mortis*, there must be an absolute

manual delivery to constitute, or probably more correct-
ly speaking, to complete, a gift, as it takes, first, the in-
tention to give, and then the delivery—as it is the in-
flexible rule that there can be no gift of either kind with-
out both the intention to give and the delivery. *Ward*
v. *Turner*, 1 White & Tudor's Leading Cases, 1205 and
notes, English & American. There must be a delivery.
*Adams* v. *Hayes, supra*; *Shirley* v. *Dew*, 36 N. C., 130;
*Medlock* v. *Powell*, 96 N. C., 499; *Golding* v. *Hobery*,
35 Am. St. Rep., 357.

The leading case in this State is *Adams* v. *Hayes* and
this cites and approves *Ward* v. *Turner, supra*, as the
leading case on the subject of gifts *causa mortis*, and the
correct exposition of the law on that subject. And we
have felt it to be our duty to follow that case, so well
considered by the very able court as constituted at that
time.

Following this case, founded on *Ward* v. *Turner*, we
feel bound to give effect to *constructive delivery*, where
it plainly appears that it was the intention of the donor
to make the gift, and where the things intended to be
given are *not* present, or, where present, are incapable
of *manual* delivery from their size or weight. But
where the articles are present and are capable of manual
delivery, *this must be had*. This is as far as we can go.
It may be thought by some that this is a hard rule—
that a dying man cannot dispose of his own. But we are
satisfied that, when properly considered, it will be found
to be a just rule. But it is not a hard rule. The law
provides how a man can dispose of all his property, both
real and personal. To do this, it is only necessary for
him to observe and conform to the requirement of these
laws. It may be thought by some persons to be a hard
rule that does not allow a man to dispose of his land by

gift *causa mortis*, but such is the law. The law provides that every man may dispose of all of his property by will, when made in writing. And it is most singular how guarded the law is to protect the testator against fraud and imposition by requiring that every word of the will must be written and signed by the testator, or, if written by some one else, it must be attested by at least *two* subscribing witnesses who shall sign the same in his presence and at his request, or the will is void. This is as to written wills. But the law provides for another kind of will, not written before the testator's death, called "nuncupative wills." This kind only applies to personal property, and until recently they were limited to small amounts. See how much more guarded they are than gifts *causa mortis*. Such wills as these must be witnessed by at least two witnesses called by the testator specially for that purpose, and they must be reduced to writing within ten days, and proved and recorded within six months.

In gifts *causa mortis* it requires but one witness, probably one servant, as a witness to a gift of all the estate a man has; no publicity is to be given that the gift has been made, and no probate or registration is required.

The Statute of Wills is a statute against fraud, considered in England and in this State to be demanded by public policy. And yet, if symbolical deliveries of gifts *causa mortis* are to be allowed, or if constructive deliveries be allowed to the extent claimed by the plaintiff, the statute of wills may prove to be of little value. For such considerations, we see every reason for restricting and none for extending the rules heretofore established, as applicable to gifts *causa mortis*.

It being claimed and admitted that the life insurance policy was present in the bureau drawer in the room

where it is claimed the gift was made, and being capable of actual manual delivery, we are of the opinion that the title to the insurance policy did not pass to the plaintiff, but remained the property of the intestate of the defendant.

But we are of the opinion that the bureau and any other article of furniture, locked and unlocked by any of the keys given to the plaintiff, did pass and she became the owner thereof.   This is upon the ground that while these articles were present, from their size and weight they were incapable of actual manual delivery; and that the delivery of the keys was a constructive delivery of these articles, equivalent to an actual delivery if the articles had been capable of manual delivery.

Still following *Ward* v. *Turner*, we are of the opinion that the other articles of household furniture (except those in the plaintiff's private bed chamber) did not pass to the plaintiff, but remained the property of the defendant's intestate.

We do not think the articles in the plaintiff's bed chamber passed by the *donatio causa mortis*, for the same reason that the other articles of household furniture did not pass—want of delivery—either constructive or manual.   But as to the furniture in the plaintiff's bed room ($45) it seems to us that there was sufficient evidence of both gift and delivery to support the finding of the jury, as a gift *inter vivos*.   The intention to give this property is shown by a number of witnesses and contradicted by none.

The only debatable ground is as to the sufficiency of the delivery.   But when we recall the express terms in which he repeatedly declared that it was hers; that he had bought it for her and had given it to her; that it was placed in her private chamber, her bed room, where

we must suppose that she had the entire use and control of the same, it would seem that this was sufficient to constitute a delivery. There was no evidence, that we remember, disputing these facts. But, if there was, the jury have found for the plaintiff, upon sufficient evidence at least to go to the jnry, as to this gift and its delivery. As to the piano there was much evidence tending to show the intention of Van Pelt to give it to the plaintiff, and that he had given it to her, and we remember no evidence to the contrary. And as to this, like the bed room furniture, the debatable ground, if there is any debatable ground, is the question of delivery. It was placed in the intestate's parlor where it remained until it was burned. The intestate insured it as his property, collected and used the insurance money as his own, often saying that he intended to buy the plaintiff another piano, which he never did. It must be presumed that the parlor was under the dominion of the intestate, and not of his cook, house keeper, and hired servant. And unless there is something more shown than the fact that the piano was bought by the intestate, placed in his parlor, and called by him ''Miss Julia's piano'', we cannot think this constituted a delivery. But, as the case goes back for a new trial, if the plaintiff thinks she can show a delivery she will have an opportunity of doing so. But she will understand that she must do so according to the rules laid down in this opinion—that she must show actual or constructive delivery equivalent to actual manual delivery. We see no ground upon which the plaintiff can recover the insurance money, if the piano was not hers.

We do not understand that there was any controversy as to the plaintiff's right to recover for her services, which the jury have estimated to be $125. The view

of the case we have taken has relieved us from a discussion of the exception to evidence, and as to the charge of the court. There is no such thing in this State as *symbolical delivery* in gifts either *inter vivos* or *causa mortis*. There is a hint in that direction in the case of *Shirley* v. *Dew*, *supra*, and this is now overruled. There is error.

New trial.