## APACHE STATE BANK v. DANIELS.

No. 1336.   Opinion Filed December 12, 1911.

Rehearing Denied February 6, 1912.

(121 Pac. 237.)

1. COURTS—Appellate Jurisdiction. Under the provisions of section 16, art. 7, and section 2 of the Schedule of the Constitution, an appeal lies to the district court from the county court, in probate matters, in those cases in which an appeal was allowed by the statutes of Oklahoma Territory. Wilson's Rev. & Ann. St. 1903, sec. 1793; Comp. Laws 1909, sec. 5451.

2. TRIAL—Appeal and Error—Trial by Court—Equitable Causes—Submission of Questions to Jury. In an equity proceeding, the trial judge may, in his discretion, impanel a jury and submit to it distinct questions of fact for its advice; but he should not in such cases submit the case to a jury for a general verdict for the plaintiff or the defendant. Such a submission is erroneous; but a case should not be reversed for such an error, where it affirmatively appears that, notwithstanding the verdict of the jury, the trial judge reviewed the evidence and reached the same conclusion as the jury.

3. GIFTS—Gifts Causa Mortis. James Daniels, on his deathbed, said to his wife: "Florence, I give you all of my bank stock, and all of my property and my diamonds. Take my key to our box and keep it, and allow no one to have it." The bank stock was in

a small tin box in a vault in an adjoining room, to which the deceased and his wife had access. There were two keys to this tin box, one of which was usually carried by the deceased and one key by his wife. At the time these words were spoken, the wife had both keys on her belt, and transferred his key from his key ring to hers. Nothing else was done prior to his death. **Held,** that this was not a sufficient delivery to constitute a valid **donatio causa mortis.**

(Syllabus by Ames, C.)

*Error from District Court, Rogers County;*
*John H. Pitchford, Judge.*

Proceeding by the Apache State Bank against Florence Daniels, administratrix of the estate of James Daniels, deceased. Judgment for defendant, and plaintiff brings error. Reversed and rendered.

*John H. Burford* and *Frank B. Burford,* for plaintiff in error.

*Davenport & Hall, Ziegler & Dana,* and *Chas. Bucher,* for defendant in error.

Opinion by AMES, C. The plaintiff instituted this proceeding by filing in the county court of Rogers county an application to require the defendant, who was administratrix of the estate of James Daniels, deceased, to inventory 168 shares of the capital stock of the Farmers' & Merchants' Bank of Catoosa. The application alleged that this bank stock had formerly belonged to one James Daniels, deceased; that upon his death James Daniels left two heirs at law, one being his widow, Florence Daniels, the defendant, who was also the administratrix of the estate, and the other his father, S. H. Daniels; that the plaintiff had recovered judgment against S. H. Daniels for $1,300; that it had thereafter brought an action in the district court of Rogers county against S. H. Daniels and Florence Daniels, as the heirs of the deceased, for the purpose of subjecting the interest of S. H. Daniels in said stock to the payment of said judgment; that in said cause a receiver had been appointed, who was then in possession of the stock; that the plaintiff was entitled to have

the distributive share of S. H. Daniels applied to the payment of its judgment; and that the defendant was claiming the said stock as her individual property and refusing to inventory it. The defendant moved to quash the citation, and the motion was overruled.  She then replied admitting that she held the stock, but claiming it as her individual property and denying that she was required to inventory it as property of the estate.  The issue raised by these pleadings was tried in the county court, and an order was made directing the defendant, as administratrix, to inventory the stock as the property of the estate. . An appeal was taken to the district court, which the plaintiff moved to dismiss because the court was without jurisdiction; the order from which the appeal was taken not being a judgment from the rendition of which an appeal would lie from the county court to the district court.  This motion was overruled, and the case proceeded to trial, resulting in a judgment in favor of the defendant, and the case is here on the plaintiff's petition in error.

The defendant claims title to the stock by virtue of a gift from her husband while he was on his deathbed, and it appears from the evidence that the stock was in a tin box in the vault of the Catoosa bank; that the defendant and her husband lived in a room adjoining the banking room; that the deceased died on Sunday afternoon; that the defendant knew the combination and was accustomed to opening the vault; that a few hours prior to his death the deceased said to his wife that he wished to give her his bank stock and other property in the box, and for her to take the key and not let anybody have it; that at the time there were two keys to the box, one ordinarily carried by the deceased, and the other by the defendant, but that the defendant had both keys in her possession at the time of this gift; and that upon these words being spoken she transferred the key of the deceased from his key ring to her key ring, but did not enter the vault or take possession of the box.

The questions which are raised by the record are as follows:  (1) Did the district court have jurisdiction of this appeal?  (2) Was it reversible error for the district court to

impanel a jury and submit the issues for a general verdict? (3) Was the delivery sufficient to constitute this a valid *donatio causa mortis*? (4) If so, does the statute providing that the capital stock of a corporation is personal property and can only be transferred by delivery and indorsement defeat the gift? (5) Was the defendant, under the circumstances of this case, a competent witness for herself?

1. We think the district court had jurisdiction. It is admitted that, under the statutes in force in the territory of Oklahoma, an appeal in this case would lie from the probate to the district court, under section 1793, Wilson's Rev. & Ann. St. 1903 (Comp. Laws 1909, sec. 5451), which is as follows:

"An appeal may be taken to the district court from a judgment, decree or order of the probate court: First. Granting, or refusing, or revoking letters testamentary or of administration, or of guardianship. Second. Admitting, or refusing to admit, a will to probate. Third. Against or in favor of the validity of a will or revoking the probate thereof. Fourth. Against or in favor of setting apart property, or making an allowance for a widow or child. Fifth. Against or in favor of directing the partition, sale or conveyance of real property. Sixth. Settling an account of an executor, or administrator or guardian. Seventh. Refusing, allowing or directing the distribution or partition of an estate, or any part thereof or the payment of a debt, claim, legacy or distributive share, or, eighth. From any other judgment or order of the probate court, or of the judge thereof affecting a substantial right."

It is urged that section 16 of article 7 of the Constitution limits such appeals to judgments only, and therefore, in substance, denies the right of appeal from all orders which may not be treated as judgments. That section is as follows:

"Until otherwise provided by law, in all cases, arising under the probate jurisdiction of the county court, appeals may be taken from the judgments of the county court to the district court of the county in the same manner as is now provided by the laws of the territory of Oklahoma for appeals from the probate court to the district court, and in all cases appealed from the county court to the district court, the cause shall be tried *de novo* in the district court upon questions of both law and fact."

Section 2 of the Schedule provides:

"All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law."

The question here raised is settled by the case of *Bowman v. Bilby*, 24 Okla. 735, 104 Pac. 1078, where the question involved was whether or not justices of the peace, after statehood, had jurisdiction in forcible entry and detainer cases. The Constitution prescribed the jurisdiction of justices of the peace "until otherwise provided by law," and did not confer upon them jurisdiction in such cases. The laws in force in the territory of Oklahoma did. Section 2 of the Schedule extended these laws where not repugnant to the Constitution, or locally inapplicable, and the question involved was whether or not that jurisdiction conferred by the territorial statute remained in addition to that jurisdiction which was conferred by the Constitution. That is much the same question which is here presented. In the opinion it is said (24 Okla. 738, 104 Pac. 1079):

"It was evidently the intention of the framers of the Constitution to leave the question of the jurisdiction of justice of the peace open to be fixed by the proper legislative authority, and in the meantime, to avoid inconvenience, to adopt by the Schedule the old Oklahoma Territory statutes on the subject. The enactment of section 2 of the Schedule had precisely the same effect as if the legislative assembly had convened immediately after statehood and passed a statute on the subject of forcible entry and detainer, the same in purport as that in force in Oklahoma Territory when statehood became a fact. If the Legislature could pass such a law— and there seems to be no room for doubt upon this proposition—the constitutional convention could also do so by adopting the law upon the subject from the territory of Oklahoma in conformity with the Enabling Act. This, to our mind, is what it did; and it was done in order that no inconvenience may arise by reason of the change from the territorial form of government."

*Burdett v. Burdett*, 26 Okla. 416, 109 Pac. 922, and *Burnett v. Jackson*, 27 Okla. 275, 111 Pac. 194, are cases in which

this right of appeal was exercised, although no question was raised as to the jurisdiction of the court.

2. At the trial in the district court the case was submitted to the jury for a general verdict, and the jury was instructed as in an action at law. This was error. The statute provides (Wilson's Rev. & Ann. St. 1903, sec. 1807; Comp. Laws 1909, sec. 5465):

"When the appeal is on questions of fact or on questions of both law and fact, the trial in the district court must be *de novo,* and shall be conducted in the same manner as if the case and proceedings had lawfully originated in that court; and such appellate court has the same power to decide the questions of fact which the probate court or judge had, and it may, in its discretion, as in suits in chancery, and with like effect, make an order for the trial by jury of any or all the material questions of fact arising upon the issues between the parties, and such an order must state distinctly and plainly the questions of fact to be tried."

It will be noted that, while the court had a perfect right to impanel the jury and submit issues to it, the statute specifically requires that such an order of submission "must state distinctly and plainly the questions of fact to be tried." The question of impaneling a jury rests within the discretion of the court. *Cartwright v. Holcomb,* 21 Okla. 548, 97 Pac. 385. When a jury is impaneled in an equity case, it should not be empowered to return a general verdict, nor answer conclusions of law; but specific and distinct questions of fact should be submitted to it. Our statute, however, provides (Comp. Laws 1909, sec. 5680):

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

Applying this mandatory provision, we must inquire whether this error in procedure affects a substantial right of the plaintiff, and in response to this inquiry we find in the journal entry:

"And the jury is now discharged from the further consideration of said cause. And the court having carefully weighed the evidence, and being further advised in the premises, ap-

proved the findings and verdict of the jury and accepts the advice of the jury as in its verdict contained, and renders judgment upon the verdict of the jury."

As the trial judge treated the verdict as advisory, as he "carefully weighed the evidence," as he approved of the verdict, and as the responsibility rested upon him, we cannot say that this error in procedure has adversely affected a substantial right of the plaintiff. *Rankin v. Blaine County Bank,* 20 Okla. 68, 93 Pac. 536, 18 L. R. A. (N. S.) 512.

3. The difficult question in the case is whether, under the facts, there was a sufficient delivery of the subject-matter of the gift. The witness by whose testimony it was sought to establish the gift was the attending physician. When the case was first tried in the county court, this witness testified as follows:

"Q. Was there any conversation by Mr. Daniels with his wife in your presence? A. Yes, sir. Q. State as near as you can remember what that conversation was. A. Well, I advised Mr. Daniels in regard to his condition. I told him that he was growing very weak, and that, if he had any changes to make in his business affairs, he had better do it. And he called Mrs. Daniels, and she sat on the bed, and they had this conversation: She asked him if there was anything that he wanted to say to her. He says: 'Yes, Florence. I give you all of my bank stock and all of my property.' And he turned to me and asked me if I heard what he said, and I told him that I did, and he proceeded a little farther, and he said, 'I also give you my diamonds,' and that is the best that I can recall it."

The county judge found against the defendant, and in his opinion says:

"Jas. Daniels did not part with any dominion or control which he had in the property. He did not voluntarily part with the key to the receptacle which contained the certificates of stock. Jas. Daniels parted with no control, only expressed his intention to give. Florence Daniels gained no more dominion or control by virtue of the declaration of Jas. Daniels than she had before the declaration was made."

No mention was made at that trial of a key.

At the trial in the district court this witness testified on direct examination as follows:

"Q. In what way did you do that   A. Well, the way I conveyed it to him was:   On this particular visit I was sitting close to the bed talking to him, and I told him that he was growing very weak, and that I thought, if he had any different arrangements to make in his business affairs, that he had better do so. Q. You stated that to James Daniels?   A. Yes, sir.   Q. What did he say when you told him that?   A. He spoke then to his wife, Mrs. Daniels.   Q. What did he say?   A. The best I can recollect, it was this:   Now Mrs. Daniels was on the bed, I believe, sitting on the bed, I believe, and he said to her:  'Florence, I give you all of my bank stock, and all of my property and my diamonds.   Take my key to our box and keep it, and allow no one to have it.'   Now that is the best I can remember that conversation; it might not have been just in those words, but that is the sense.   Q. That is the substance of it?   A. Yes, sir; as near as I can recall it, from what he said.   Q. What, Doctor, from your experience and observation of him, did you consider the condition of his mind at the time he made that statement? A. He appeared that his mind was clear and rational, that he knew what he was doing, so far as words went.   Q. When he said that to her, did she do anything?   A. The best I remember now; it was just at the time I was doing some little thing for him; I don't remember just what it was now; but she had some keys on her belt, and she transferred keys from one packet to another; transferred one key, to the best of my recollection, from one bunch of keys on the key ring to another.   I don't know.   I didn't see the key, and don't know just what she did do; but I saw that much.   Q. About how long was that prior to his death?   A. Well, it wasn't very long; just the exact time, I couldn't say; whether it was an hour or more, I don't know, but it certainly wasn't long."

On cross-examination he testified as follows:

"Q. He was in a condition now that he could not talk audibly, except a little above a whisper?   A. Just above, it was hardly a whisper.   It was above a whisper, just slightly above a whisper, just enough to—hear.   Q. In answer to your question, what was the first thing that he said?   A. The first thing that he said to Mrs. Daniels?   Q. Just repeat his language.   A. He says, 'Florence, I give all of my bank stock and all of my property,' and just about that time he turned his head a little to one side and asked me if I heard what he was saying, and I told him that I did, and to go ahead, and he says, 'and my diamonds.   Take my key to our box and keep it, and allow no one

to have it.' Q. "Take my key to our box?' A. Yes, sir; 'and keep it, and allow no one to have it.' Now he of course didn't speak in a very loud tone, and that is the way that I heard it, and the best I can recollect; that is the words he spoke. Q. After he mentioned the diamonds, he then said, 'Take my key to our box'? A. Yes, sir. Q. That is the words? A. Yes, sir; as near as I can remember. Q. 'Take my key to our box and let nobody have it?' A. Yes, sir; in so far as I can recollect. Q. Was that all of the conversation? A. Well, so far as I remember, there might have been something else said; but I can remember nothing more now. Q. You don't recollect anything else? A. No, sir. Q. Did you get up and leave then? A. I believe I got up immediately and left. Q. Did Florence Daniels get up then? A. I don't know whether she got up right at that moment or not; I think she sat up a little on the bed. Q. What was it she was doing, if anything? A. She was transferring some keys. Q. Now, just state what she did, about transferring keys there. A. It seemed that she took a key from one of the bunches and put it on another. Q. Where did she have those two bunches of keys? A. They were hanging about her dress. Q. In front? A. They were hanging on her dress or belt, I didn't notice; but she had some keys about her. Q. Then she had two separate bunches of keys hanging to her dress? A. Yes, sir; I don't know that she had them hanging to her dress, but I distinctly remember that she had two bunches. I heard the noise, and I know that she had two bunches, and transferred a key. Q. How did she transfer it? A. She took it from one of the rings, and put it on another. Q. Just took it off of one bunch, and put it on another? A. Yes, sir; the best I can recollect."

As previously stated, the court submitted this case to a jury for a general verdict, and in doing so instructed the jury as though it were an ordinary action of law. While that was improper, still an examination of the instructions will give the view of the law which the court applied to the facts in this case. The fourth instruction was as follows:

"A delivery of keys to a locked receptacle, accompanied by words of gift of articles contained therein, is sufficient to transfer the contents of the receptacle, and in this case, if you find that James Daniels delivered to the defendant a key or keys to the box containing the bank stock in question, and stated by word of mouth that he gave her such bank stock, then I instruct you that such words of gift, together with the delivery of a key

to the box containing the stock, would constitute a valid gift and would vest the equitable title to the bank stock contained in such box in the defendant herein."

It will be observed that no distinction is made between delivering the key of a receptacle which cannot be conveniently moved on account of its size or bulk, and one which is small and easily handled. The bank stock involved was kept in a small tin box about 6 inches wide, 12 inches long, and a few inches deep, to which deceased and his wife, the defendant, each carried a key. This box in turn was kept in the vault of the bank. The bank was conducted in a small room about eighteen feet wide and thirty feet long; the rear ten feet of which being cut off by a partition and used by the deceased and his wife as their home. The vault was at the rear of the banking room, and between it and the bedroom. It opened by an ordinary combination lock, which the defendant was in the habit of opening; she having been for two or three years the assistant cashier of the bank. The deceased was the cashier, and he and his wife seemed to have been the only regular employees. The deceased had been sick for about ten days, during which time the president of the bank had assisted the defendant as much as he could; but he does not seem to have been an active officer, and did not know the combination. The money and valuable papers of the bank were kept in a steel safe, inside of the vault, governed by a time lock; but the tin box was not kept in that safe, but merely set in the vault along with the boxes of other customers. During his illness the deceased seemed to have been attended by the doctor, his wife, and a sister. He died on Sunday afternoon, and the conversation which has been quoted took place about two hours before his death. His sister was not present at the time. Nothing was done until after the death of the deceased, other than that detailed in the testimony quoted, and the question is whether there was such a delivery as to make this a valid *donatio causa mortis*. In reaching a conclusion, we have been assisted by able briefs and oral argument of counsel. We find a conflict in the authorities difficult to reconcile, and it is not our purpose to undertake an exhaustive review, or even

citation, of the many authorities on the subject, although we have examined all that have been cited by counsel, as well as others disclosed by our own research. The question involved being presented for the first time in this state, and courts of high standing differing from each other on the subject, causes us to resort to the general policy of our own state, in order to get a safe foundation on which to build.

The bank stock involved in this case comprises practically the entire estate of the deceased, and, being disposed of by him on his deathbed, amounts in substance to a testamentary disposition. Of course, we do not confuse a *donatio causa mortis* with a testamentary disposition, but merely call attention to the fact that, under the circumstances of this case, this donation is substantially equivalent to a testamentary disposition. We inquire, therefore, as to the policy of the people of this state relative to testamentary dispositions. The policy is evidenced by our statutes, brought forward from the territory of Oklahoma by a direct vote of the people in the adoption of the Constitution.

In the absence of a valid testamentary disposition, the law prescribes the succession and preserves a just and equitable distribution amongst relatives of the deceased. However, one who is not satisfied with these general rules of succession may dispose of his property otherwise, but in doing so he must comply with the exact procedure authorized by law. Unless his will is entirely in his own handwriting, he must execute it in the presence of two witnesses, at the time he must declare to them it is his last will and testament, and he must request them to sign as witnesses, and they must sign it in his presence and in the presence of each other. Unless these formalities are substantially complied with, the will is void, and the courts will not stop to inquire or to enforce the intention of the deceased, but will require the distribution of his property amongst his heirs according to the will of the people. An unwritten will is recognized by our law only in case the decedent, at the time of his death, was in the military service and in actual contempla-

tion of death, or in expectation of immediate death from an injury received the same day, and it must then be proved by two witnesses present at the making of it, and even then "the estate bequeathed must not exceed in value the sum of one thousand dollars." Comp. Laws 1909, sec. 8894. It is apparent, therefore, that the policy of our people is to insure the distribution of an estate according to the statutory rule of succession, unless the deceased in due form, and with proper solemnities, has declared a contrary purpose.

A gift *causa mortis* is not mentioned in our statutes, and therefore comes to us as a part of the common law; but in taking it we must take it in connection with the public policy of our state as evidenced by its statutes. The common law in turn gets the idea from the Roman law, and in the Roman law, according to the Institutes of Justinian, five witnesses were required, in addition to the delivery of the donation. At the common law, however, no specific number of witnesses is required; but the gift must be established by clear and convincing evidence, and it must be accompanied by a delivery of the subject-matter. Mere words, of course, cannot constitute a gift, either *inter vivos* or *causa mortis,* because that would conflict with the fundamental notion of consideration as the basis of contract. Mere words unaccompanied by delivery could only be a promise, and there being no consideration the promise could not be enforced, and therefore the gift would not be complete. In order that the gift be valid, it must be completely executed, because if there remains anything to be done the donor may refuse to do it. When a gift has been completed by the actual delivery of the subject-matter, it, of course, is valid, and these principles apply to a gift *causa mortis* as well as *inter vivos.*

A gift *causa mortis* differs from a gift *inter vivos* in that it is revocable, while it differs from a legacy in that the donee takes direct from the donor and not through his estate. A gift *causa mortis* may, according to some of the authorities, be revoked by the donor at any time prior to his death. His recovery is, *ipso facto,* a revocation, and its subject-matter is subject to

the payment of debts.   In view, therefore, of the nature of this
gift, we feel justified in considering it in connection with the
policy of our law concerning testamentary dispositions.

The general principles which we have laid down are stated
in many authorities, some of which are as follows:  3 Pomeroy's
Equity Jurisprudence (3d Ed.) pars. 1146-1151; *Ward v. Tur-
ner,* 2 Ves. Sen. 431 (same case 28 Eng. Rep., full reprint, 275) ;
*Basket v. Hassell,* 107 U. S. 602, 2 Sup. Ct. 415, 27 L. Ed. 500;
*Gano v. Fisk,* 43 Ohio St. 462, 3 N. E. 532, 54 Am. Rep. 819;
*Newman v. Bost,* 122 N. C. 524, 29 S. E. 848; *Parish v. Stone,*
14 Pick. (Mass.) 198, 25 Am. Dec. 378 (Shaw, C. J.); *Harris
v. Clark,* 3 N. Y. 93, 51 Am. Dec. 352; *Raymond v. Sellick,*
10 Conn. 480; *Drew v. Hagerty,* 81 Me. 231, 242, 17 Atl. 63,
3 L. R. A. 230, 10 Am. St. Rep. 255; *Cutting v. Gilman,* 41 N.
H. 147, 152.

We now approach the exact question as to whether there
was a sufficient delivery in this case.   *Ward v. Turner,* decided
by Lord Hardwicke in 1752, is one of the earliest cases contain-
ing an exhaustive discussion of this subject, and it is interesting
to note in passing that Lord Mansfield, then Mr. Murray, was
of counsel in this case.   At page 442 of 2 Ves. Sen. (page 282
of the reprint), Lord Hardwicke says:

"It is argued that though some delivery is necessary, yet
delivery of the thing is not necessary, but delivery of anything
by way of symbol is sufficient.   But I cannot agree to that; nor
do I find any authority for that in the civil law, which required
delivery to some gifts, or in the law of England, which re-
quired delivery throughout.   Where the civil law requires it,
they require actual tradition, delivery over of the thing.   So in
all the cases in this court delivery of the thing given is relied
on, and not in the name of the thing."

Mr. Justice Matthews, in delivering the opinion of the
court, in *Basket v. Hassell,* at page 614 of 107 U. S., at page
422 of 2 Sup. Ct. (27 L. Ed. 500), says:

"The point, which is made clear by this review of the de-
cisions on the subject, as to the nature and effect of a delivery
of a chose in action, is, as we think, that the instrument or
document must be the evidence of a subsisting obligation and

be delivered to the donee, so as to vest him with an equitable title to the fund it represents, *and to divest the donor of all present control and dominion over it, absolutely and irrevocably,* in case of a gift *inter vivos,* but upon the recognized conditions subsequent, in case of a gift *mortis causa;* and that a delivery which does not confer upon the donee the present right to reduce the fund into possession by enforcing the obligation, according to its terms, will not suffice."

In 20 Cyc. 1234, it is said:

"Property kept in a bureau, chest, or trunk not readily accessible, and ponderous or bulky articles kept in a warehouse, may be delivered by delivering the key to the receptacle with the intent to pass title to the property therein contained. But the delivery of the key to a receptacle which is near at hand and contains property which might easily be removed and an actual delivery made is not sufficient, as it is not the best delivery possible under the circumstances."

Chancellor Kent says:

"Delivery, in this, as in every other case, must be according to the nature of a thing. It must be an actual delivery, so far as the subject is capable of delivery. * * * When the gift is perfect, by delivery and acceptance, it is then irrevocable. * * * If the subject of the gift be not capable of actual delivery, there must be some act equivalent to it." (2 Kent's Commentaries, 555, 556.)

In *Drew v. Haggerty,* 81 Me. 231, 242, 17 Atl. 63, 64 (3 L. R. A. 230, 10 Am. St. Rep. 255), it is said:

"We think this ruling was correct. If the act of delivery was for no other purpose than to invest the donee with possession, no reason is perceived why it might not be dispensed with, when the donee already had possession. But such is not its only purpose. It is essential in order to distinguish a gift, *causa mortis,* from a legacy. Without an act of delivery, an oral disposition of property, in contemplation of death, could be sustained only as a nuncupative will, and in the manner and with the limitations provided for such wills. Delivery is also important as evidence of deliberation and intention. It is a test of sincerity and distinguishes idle talk from serious purposes. And it makes fraud and perjury more difficult. Mere words are easily misrepresented. Even the change of an emphasis may make them convey a meaning different from what the speaker intended. Not so of an act of delivery. Like the

delivery of a turf, or the delivery of a twig, in the ancient mode of conveying estates, or the delivery of a kernel of corn, or the payment of one cent of the purchase money, to make valid a contract for the sale of cargo of grain, an act of delivery accomplishes that which words alone cannot accomplish. Gifts, *causa mortis*, ought not to be encouraged. They are often sustained by fraud and perjury. It was an attempt to sustain such a gift by fraud and perjury that led to the enactment of the statute for the prevention of fraud and perjury."

In *Cutting v. Gilman*, 41 N. H. 147, 152, the court say:

"A delivery is indispensable to the validity of a gift *causa mortis*. It must be an actual delivery of the thing itself, or of the means of getting possession and enjoyment of the thing, and there must be something amounting to delivery at the time of the gift; for it is not the possession of the donee, but the delivery to him by the donor, that is material. An after-acquired possession, or a previous and continuing possession of the donee, though by authority of the donor, is insufficient. *Miller v. Jeffress*, 45 Va. 472; *Kenney v. Public Administrator*, 2 Bradf. Sur. (N. Y.) 319."

In *Smith v. Zumbro*, 41 W. Va. 623, 24 S. E. 653, paragraph 1 of the syllabus is as follows:

"Delivery at the time of making the gift is essential to a perfect gift *causa mortis*. It is not the possession of the donee, but the delivery to him by the donor, that is material. An after-acquired possession or a previous and continuing possession of the donee, though by the authority of the donor, is insufficient."

In an exhaustive note at page 895 of 99 Am. St. Rep., the author cites a great many cases sustaining the following propositions:

"It is absolutely necessary that there be a delivery of the subject-matter of a gift *causa mortis* during the donor's lifetime, and in this respect it does not differ from a gift *inter vivos*." (Citing cases.)

"Not only must there be a delivery, but the possession of the donee must be a continued one, and the donor have parted with all control and dominion over the subject-matter of the gift in favor of the donee, so as to put it out of his power to repossess himself thereof, and no further act be required on his part to vest the title in the donee." (Citing cases.)

In *Newman v. Bost,* 122 N. C. 524, 29 S. E. 848, the deceased, in his last illness, sent for the plaintiff, the donee, who was not in the room, and asked her to hand him his private keys, which she did. He then handed her the bunch of keys and told her to take them and keep them; that he desired her to have them and everything in the house. He then pointed out certain articles of furniture in the house, and asked that his chamber door be opened, and pointed in the direction of the halls and other rooms, and repeated that everything in the house was hers; he wanted her to have everything. Amongst other things he pointed out was a bureau, which was in the room, and one of the keys which he handed her was a key to this bureau, and a bureau drawer which this key unlocked contained in it a life insurance policy payable to the deceased's estate, together with other papers, and there was no other key that unlocked the drawer. After stating the result of the authorities, at page 529 of 122 N. C., at page 849 of 29 S. E., the court say:

"It is a doctrine, in our opinion, not to be extended, but to be strictly construed and confined within the bounds of our adjudged cases. We were at first disposed to confine it to cases of actual manual delivery, and are only prevented from doing so by our loyalty to our own adjudications."

At page 532 of 122 N. C., at page 850 of 29 S. E., it is said:

"Following this case, founded on *Ward v. Turner,* we feel bound to give effect to constructive delivery, where it plainly appears that it was the intention of the donor to make the gift, and where the things intended to be given are not present, or where present, are incapable of manual delivery from their size or weight. But where the articles are present and are capable of manual delivery, this must be had."

And again at pages 533 and 534 of 122 N. C., at page 850 of 29 S. E.:

"It being claimed and admitted that the life insurance policy was present in the bureau drawer in the room where it is claimed the gift was made, and being capable of actual manual delivery, we are of the opinion that the title to the insurance policy did not pass to the plaintiff, but remained the property of the intestate of the defendant. But we are of the opinion that the bureau and any other article of furniture, locked and un-

locked by any of the keys given to the plaintiff, did pass, and she became the owner thereof. This is upon the ground that while these articles were present, from their size and weight they were incapable of actual manual delivery; and that the delivery of the keys was a constructive delivery of these articles, equivalent to an actual delivery if the articles had been capable of manual delivery."

In *Keepers v. Fidelity Title & Deposit Co.,* 56 N. J. Law, 302, 28 Atl. 585, 23 L. R. A. 184, 44 Am. St. Rep. 397, the deceased gave to her sister the key to a box, declaring at the time that she thereby gave her all that the box contained. The box was in another room of the same house, in a locked closet of which deceased's mother had the key. In holding that this was not a sufficient delivery of the papers and securities contained in the box, the court says (page 308 of 56 N. J. Law, page 587 of 28 Atl., page 186 of 23 L. R. A., page 401 of 44 Am. St. Rep.) :

"We are not willing to approve the extreme views which have been adopted in the cases cited. We agree with the sentiment expressed in *Ridden v. Thrall,* 125 N. Y. 572 [26 N. E. 627, 11 L. R. A. 684], 21 Am. St. Rep. 758, that 'public policy requires that the laws regulating gifts *causa mortis* should not be extended, and that the range of such gifts should not be enlarged.' When it is remembered that these gifts come into question only after death has closed the lips of the donor; that there is no legal limit to the amount which may be disposed of by means of them; that millions of dollars worth of property are locked up in vaults, the keys of which are carried in the owners' pockets; and that, under the rule applied in those cases, such wealth may be transferred from the dying owner to his attendant, provided the latter will take the key and swear that it was delivered to him by the deceased for the purpose of giving him the contents of the vault—the dangerous character of the rule becomes conspicuous. . Around every other disposition of the property of the dead the legislative power has thrown safeguards against fraud and perjury. Around this mode the requirement of actual delivery is the only substantial protection, and the courts should not weaken it by permitting the substitution of convenient and easily proven devices."

In *Hatch v. Atkinson,* 56 Me. 324, 330, 331 (96 Am. Dec. 464), in deciding that securities contained in a trunk did not pass by delivery of the key, the court say:

"If it was the key only, as the brother swears, then very clearly there was no delivery or possession given, even for a moment; for, although delivery of the key of a warehouse, or other place of deposit, where cumbrous articles are kept, may constitute a sufficient constructive or symbolical delivery of such articles, it is well settled that the delivery of the key of a trunk, closet, chest, or box, in which valuable articles are kept, which are capable of being taken into the hand, and may be delivered by being passed from hand to hand, is not a valid delivery of such articles. The rule is that the delivery must be as perfect and complete as the nature of the articles will admit of. While a constructive delivery may be sufficient for large or cumbrous articles, it will not be sufficient for small articles, capable of a more perfect and complete delivery."

The Supreme Court of New York, in *Cooper v. Burr,* 45 Barb. 9, however, held that the delivery of keys to a bureau and trunks, with appropriate words of gift, is sufficient delivery of coin and jewelry therein contained; the syllabus containing the following:

"C., who had been confined to her room by illness for ninteen or twenty years, and to her bed for five or six years, prior to her death, kept in her room a bureau and trunks containing gold and silver coin and jewelry. About six weeks before her decease, handing to the plaintiff, who had lived with and taken care of her for 27 years, the keys of the bureau and trunks, she said: 'Mary, here are these keys. I give them to you. They are the keys of my trunks and bureaus. Take them and keep them, and take good care of them. All my property, and everything, I give to you. You have been a good girl to me, and be so still. * * * You know I have given it all to you. Take whatever you please. It is all yours, but take good care of it.' Held that the language of the donor, accompanied by a delivery of the keys to the trunks and bureau, evinced the intention of the donor, and placed the donee in possession of the means of assuming absolute control of the contents at her pleasure, and constituted a valid gift of the coin and jewelry in the trunks and bureau."

In *Walsh v. Sexton,* 55 Barb. (N. Y.) 251, 256, the deceased, during her last sickness, handed to the donee a box containing securities, with appropriate words of gift. It is held that this was sufficient; but Judge Peckham, in delivering the opinion of the court, says:

"I concur in the views expressed by the court in *Brown v. Brown,* 18 Conn. 410 [46 Am. Dec. 328], against both the principle and the policy of sustaining such a gift. But the authorities are the other way. In my judgment this doctrine is fraught with the greatest dangers. It leads into temptation, from which we all pray to be delivered, and it greatly facilitates frauds. The whole thing is wrong. But it is settled by authority, and we are not at liberty to reverse it."

So far as New York, therefore, is concerned, we have the rule claimed by the plaintiff in this case; but, the reason for that rule having been repudiated, it ceases to be of importance in other states.

In Virginia, in the case of *Thomas v. Lewis,* 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848, it is held that the delivery of the keys of a box, deposited in the vault of a bank, is a sufficient constructive delivery of the contents of the box; but in that case the box itself was at a distance from the donor, and a strong dissenting opinion was filed. In this dissent Judge Lacy quotes the following language from Lord Eldon's opinion in *Duffield v. Elwes,* 1 Bligh (N. S.) 533:

"Improvements in the law, or some things which have been considered improvements, have been lately proposed; and if, among those things called 'improvements,' this donation *mortis causa* were struck out of our law altogether, it would be quite as well."

In *Debinson v. Emmons,* 158 Mass. 592, 33 N. E. 706, it is said in the syllabus:

"A valid gift *causa mortis* takes place where the donor, on her deathbed, delivers to the donee the keys of her trunk, which is in the room, and declares that the trunk and its contents are the donee's property."

Other cases might be cited tending to support both sides of this controversy; but we have cited enough to show the reason

of the courts as well as the conflict of judicial decisions. It seems to us that the weight of authority, the better reason, and the policy of our law, as evidenced by our statutes, are against this gift, and we should not permit our sympathy to make a bad rule which, while perhaps not in this case, would eventually encourage fraud and perjury.

4 and 5. Having reached the conclusion which has been stated, it is needless for us to determine whether it was necessary for the certificates of stock to be indorsed, or whether it was error to permit the wife to testify as a witness in the cause.

We are therefore of the opinion that the case should be reversed, and judgment rendered for the plaintiff in error.

By the Court: It is so ordered.