JUNIUS BROOKS, Administrator, *v.*
JUDITH MITCHELL.

[No. 32, April Term, 1932.]

2

*Decided June 21st, 1932.*

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Ernest F. Fadum* and *T. Tilden Kelbaugh,* with whom was *James F. Thrift* on the brief, for the appellant.

*Harry O. Levin,* with whom was *C. Morton Goldstein* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The principal questions presented by this appeal are (1) whether a gift *causa mortis* of a deposit in a savings bank can be effected by the mere delivery to the donee of the passbook issued by the bank to the donor as evidence of his title to the same, where the donor sufficiently indicates an intention of assigning or transferring the fund to the donee but executes no written order for the transfer or assignment thereof; and (2) whether, assuming that such a gift can be validly made in that manner, the evidence in this case is sufficient to support a finding that one Alton Brooks, late of the City of Baltimore, deceased, did in fact give to Judith Mitchell, the appellee, a fund deposited to his credit in the savings department of the Baltimore Trust Company.

The circumstances out of which those issues arise are these: Alton Brooks was a laborer, unmarried, frugal, careful, and industrious, with a horror of coming to old age and physical infirmity without adequate means of support. Consequently, by thrift and careful management, at his death he had accumulated what for him was a substantial estate, which included a deposit of $5,600 in the savings department of the Baltimore Trust Company. He was born some fifty years ago in King and Queen County, Virginia, and he, his brother Junius Brooks, Judith Mitchell, and Stephen W. Mitchell, her husband, all grew up as children together in the same neighborhood. Alton came to Baltimore to mend his fortunes and to live in 1916, Mr. and Mrs. Mitchell followed shortly afterwards, and at or about the same time Junius also moved there. These four former Virginians kept up in their new surroundings their early friendship, met occasionally, and from time to time Alton and Junius, neither of whom was married, visited the Mitchells at their home. The Mitchells had before coming to Baltimore seen perhaps more of Alton than of Junius, for when they were first married they boarded with him at the home of an uncle of Mrs.

Mitchell at West Point, Virginia, although the connection between all of them was close and of long standing, Mrs. Mitchell's grandfather having married the mother of Alton and Junius Brooks over forty years ago. The nearest of kin of Junius and Alton Brooks at the time of Alton's death were a half-sister and two nieces of a deceased sister. Alton appears from the record to have been a somewhat aloof and reserved man, with few connections and no intimates in Baltimore, and when, in 1930, he was stricken with what proved to be a mortal disease, he turned to Mrs. Mitchell for help, and she accepted him as a boarder.

He came to her home on the first Monday in May, 1930, after he had been for a time at the Johns Hopkins Hospital. He remained there until June 25th, 1930, when he entered the Baltimore City Hospital, where he remained eight weeks. He returned on August 20th and stayed until October 26th, when he entered the West Baltimore General Hospital. He came back to her home on November 10th and died on November 12th, 1930, and was buried on November 14th, 1930, from an undertaking establishment. The cause of his death was cancer of the stomach, and the course of that disease, at least from the time he entered Mrs. Mitchell's home in May, 1930, until his death, appears to have been steadily progressive, and by October it had reached a point where consciousness of its inevitable outcome could not well be avoided.

After his death a black satchel containing a passbook for a deposit in the savings department of the Baltimore Trust Company was found in the Mitchell home, and at his request that book was delivered to Junius Brooks, who later administered on his brother's estate. Mrs. Mitchell stated that it was delivered to Brooks in the belief that it would be returned to her, and, upon his failure to return it, she, on December 27th, 1930, filed the bill of complaint in this case against Junius Brooks, administrator of the estate of Alton Brooks, in which she prayed that the deposit be declared to be her sole property, that the trust company be enjoined from paying it to any other person, and that Junius Brooks be

enjoined from withdrawing said deposit or transferring or otherwise disposing of the bank book pending the case. The theory upon which that relief was asked was that Alton Brooks had on October 25th, 1930, *mortis causa* given the bank book and the fund which it represented to the complainant. The defendant answered, the case was heard upon bill, answer, and evidence, and on December 10th, 1931, the court decreed the deposit to be the property of Mrs. Mitchell and directed the administrator to pay it, together with accrued interest, to her. The appeal is from that decree.

The important issues of fact are: (1) Did Alton Brooks deliver to Mrs. Mitchell the savings bank deposit passbook for the purpose of making a gift to her of the fund which it represented? (2) Did she actually take possession of the book during his life? and (3) Did he at the time of such delivery believe that his death was imminent and inevitable?

The direct evidence relating to the delivery of the bank book is not contradicted, but there was some conflict in the evidence as to certain corroborative circumstances attending the transaction.

Mrs. Mitchell testified that, as soon as Alton Brooks died, she notified Junius, his brother, and that he shortly after that came to her house; that on that visit she opened the black suitcase which had belonged to Alton and which at the time was in her bedroom; that she unlocked it in his presence with a key in her possession, and found in it passbook No. 20110, issued by the Highlandtown Branch of the Baltimore Trust Company, evidencing a savings account in the name of Alton Brooks in the amount of $5,600 deposited on April 30th, 1930, which contained the following rules and by-laws:

"The Bank Book must be presented when money is deposited or withdrawn. The acceptance of the Bank Book shall constitute an acknowledgment on the part of the depositor of notice of these rules and regulations and his agreement to be bound thereby. When the first deposit is made, the depositor shall sign a signature card subscribing to the rules and regulations of the Savings Department of the Bank, and the depositor

6

and his legal representatives shall be bound by said rules and regulations and any amendments thereto. Money on deposit may be withdrawn by the depositor, or his legal representative, on presentation of the Bank Book and a proper order. No withdrawals may be made by check. No assignment or transfer of this Bank Book or of the account represented thereby need be recognized by the Bank unless the consent of the Bank shall be first obtained, and a memorandum thereof entered therein."

She further testified that after his brother's funeral Junius returned to her home and asked for Alton's bank books and his watch. She told him she claimed the bank book of the Baltimore Trust Company deposit, but, when he said that he could not administer the estate unless she delivered it to him, she let him have it, that Alton had another bank book which he kept in a square box which he took to the hospital with him, and that after his death she discovered that book and gave it to Junius also. She further said that with the bank book in the black satchel was an insurance policy made out for the benefit of Junius, and that he took with him before the funeral, and that she had told Junius that Alton had told her that it was in the suitcase, and that he wanted his funeral expenses paid out of it.

Stephen W. Mitchell, husband of the complainant, said that, on the night before Alton went to the West Baltimore General Hospital, he, his wife, and his daughter Jeanette were in his room, that there were at the time in the room a brown suitcase and a black suitcase, and that Alton pointed to the black suitcase and said: " 'Judith, I am giving you the black suitcase and that suitcase contains a life insurance policy. If I die, take that and bury me. Everything else you find in the suitcase is yours.' (The Court): Did he have the key to the suitcase? (The Witness): No, sir, he did not have it. (The Court): Do you know where the key was? (The Witness): No, sir, my wife had the key to the suitcase in a little pocketbook. Q. (By Mr. Levin): Were you

present when she got the key? A. Yes, sir, I was. Q. When was that? A. That was in the afternoon after he died. Q. I mean when he gave her the key. Were you present when he gave her the key? A. No, I wasn't present when he gave her the key. Q. After this statement was made by Mr. Brooks, what did your wife do, if anything? A. Well, after he gave her the suitcase, she took the suitcase and put it in her bedroom. Q. Who took it out of Alton Brooks' room? A. She did, my wife took it out. (The Court): In his presence? (The Witness): Yes, sir, in his presence. She carried it out and put it in her bedroom. (The Court): He saw her when she did it? (The Witness): Yes, sir, it was right before him." And that on the following morning he said to the witness that he had given his wife the suitcase and that she understood everything and knew just what to do.

Jeanette Mitchell, the daughter, referring to the same suitcases, gave this version of the transaction: "Q. Did you see those suitcases? A. Yes, sir. So did Mr. Alton Brooks see them, because they were right on the side of the wall and he could look right at them from the bed. One was a brown suitcase and the other a black one, large suitcases. My mother was trying to cheer him up; was rubbing his head and doing everything she could for him, and he said, 'Judith, you have been wonderful to me.' He said, You are the onliest friend I have in the world, but for you I would not want to live.' He said, 'See that black suitcase there, everything in there, all except the life insurance policy, is yours; and if I never come back home again you will be well repaid for whatever you did for me.' My mother rubbed his head and said, 'You should not do that, I will appreciate the suitcase,' and she took it out of the room and put it in her bedroom. Q. When did she take it out? A. When we left the room about twenty minutes later. Q. Did you see anything of a key? A. Well, the key was in a dresser drawer in the room. He told my mother to look in there and get the key to it. That was said at the time he gave her the suitcase. She went and got the key and took the suitcase and stuck it in her room because she thought it was hers then."

The deposition of Richard J. Small, a nonresident, taken before one of the standing examiners of the court, was offered and admitted in evidence over objection. The objection was that the petition for taking the testimony in that manner was not supported by affidavit, but, as the petition does not appear in the record, and as it does appear that the appellant was present when the testimony was taken, and cross-examined the witness, it cannot be said in this court that its admission was error. *Waters v. Waters,* 35 Md. 546.

Small is a seaman, and at the time he testified, was a mate on a vessel trading between Boca Grande and the West Indies. He testified that he had known Alton Brooks for sixteen or seventeen years, and had first met him at King and Queen County, Virginia; that he had seen him several times after he came to Baltimore and twice in the last year; that the last time he saw him was in his (Alton's) room at Mrs. Mitchell's home on or about October 26th, 1930; that on that occasion Alton told witness that he was suffering from cancer of the stomach; and then the following colloquy occurred: "I said, 'You have right smart money, why don't you spend some of this money on yourself in the condition you are in, with the disease you have you are not liable to live very long,' and he said, 'Dick, I have a little money in that suitcase lying in the corner; I have a bank book and an insurance policy there.' He didn't say how much it was and I didn't ask him. Then he said, 'If anything happens to me there is the insurance policy, I want to be buried by that, and the rest of the money I want Ju to have,' and I said, 'Who do you mean?' and he said, 'Judith,' and I said 'Judith,' and he said, 'Yes.' He said, 'I want her to have it, because she has been so good to me, looking out for me,' and he said, 'I don't want Junius to have that money there in that satchel.' "

Dr. Herman Seidel, his attending physician, referring to the period when Alton was in the West Baltimore General Hospital, gave this testimony: "Well, as things went on, he realized that his end was apparently near, and he wanted to go back to the Mitchell home. He wanted to die home, as

he called it, and he spoke to me—when I told him it is very difficult for Mrs. Mitchell to handle him, it is almost impossible, his stomach had to be washed several times a day, we fed him rectally, something we could not do at his home, and it would be just a hardship on Mrs. Mitchell. He told me, he says, 'That is all right, Mrs. Mitchell will be well compensated for her troubles, and she can do all the work for me and I would rather die home'."

Van Lou Walton also came from King and Queen County, and had known Alton "practically" all his life, and knew Junius Brooks, Alton's brother. He saw Alton for the last time on the Sunday before Labor Day, 1930, at Mrs. Mitchell's home, and he testified that on that occasion he had this conversation with him: "I said, 'Boy, what are you going to do with your money? You ain't spending it on yourself and you can't carry it with you?' He said, 'Well, I want to keep it as long as I live and when I die I want Judith, Mrs. Mitchell, to have it.' I said, 'Junius might come in to get it.' He said, 'No, sir; I don't want him to have it.' He also said, 'before I would see him have it, I would burn it up'."

While that testimony was not contradicted, there was some conflict between the testimony of Junius Brooks and his witnesses, and that of Mrs. Mitchell and certain of her witnesses, as to such corroborative circumstances as that Mrs. Mitchell at once notified Junius Brooks of her claim to the bank book, and the precise place in her house at which the suitcase was found when she opened it in the presence of Junius. But the conflict was not of such a character as to weaken the effect of that which had been stated, and upon the whole testimony we have no hesitation in accepting the conclusion of the chancellor, that Alton Brooks did in fact give the suitcase containing the savings bank deposit passbook of the Baltimore Trust Company and the insurance policy to Mrs. Mitchell, and that he intended her to have the book as her property.

It was also sufficiently shown that Mrs. Mitchell took possession of the satchel containing the bank book during Alton's

life. She, her husband, and her daughter all testified that she took it from Alton's room on the night of October 25th, 1930, when he gave it to her and placed it in her bedroom, and the only contradiction is that of Junius, who said that, when he saw Mrs. Mitchell immediately after Alton's death, it was in a little hall right outside of Alton's door. All of these witnesses were more or less interested, and there is nothing in the record to require the court to assume that any of them was entitled to greater credence than another, and, as there was nothing in the circumstances to give one version greater probative force than the other, the chancellor was justified in accepting that of the complainant, her husband, and her daughter.

The remaining issue of fact was whether at the time he made the gift Alton was conscious that his death was imminent and inevitable. As to that, while there was some conflict in the evidence as to their existence, on the whole case, facts may be accepted as established which justified the conclusion that at that time he did know his condition and that the gift was a consequence of that knowledge.

Dr. Seidel, when asked whether on the occasion of a visit to him on the night of October 25th, Alton knew that he would shortly die, said, "He was beginning to realize it then and he realized it more while at the hospital." Small testified that on October 26th, 1930 (apparently an earlier date), Alton told him that he had cancer of the stomach and that the "Doctor thinks I will not live very long." Stephen W. Mitchell said that on the morning of the 25th Dr. Rutledge had told Alton that he had cancer and that he could do nothing for him, and, after Dr. Rutledge left, Mitchell, referring to his proposed visit to the hospital the next day, suggested that it "might be a big benefit to him," but Alton replied that he "didn't think he had much longer to live and he would just as soon be in one place as another," and on the same evening, in the presence of Jeanette Mitchell, he said that he did not think if he went to the hospital he would ever come home again. Those statements, considered in connection with his physical condition at the time, permit no

rational inference other than that on October 25th, 1930, on the eve of his last visit to a hospital, he was aware of the fatal nature of his disease and that his death was near. The only opposing evidence is that of Mrs. Shannon, who saw him on October 16th, when he told her he had "ptomaine poison," but expected to take Thanksgiving dinner with her. But her testimony is not inconsistent with that of complainant's witnesses as to his state of mind on October 25th, 1930. It is apparent that towards the end he grew rapidly worse, for ten days after his talk with Mrs. Shannon he went to the hospital, where he remained until he returned to Mrs. Mitchell's home to die two days later.

Assuming therefore that the gift of the satchel containing the bank book was effected and made *mortis causa,* the question recurs, Did that operate as an assignment of the fund which the bank book represented?

An indispensable requisite of a gift, whether *mortis causa* or *inter vivos,* is that there be a delivery of the donation (*Pomeroy,* Eq. Jur., sec. 1149; *Pennington v. Gittings,* 2 G. & J. 216; *Hitch v. Davis,* 3 Md. Ch. 267; *Conser v. Snowden,* 54 Md. 175), which may be actual or constructive (*Pomeroy, Eq. Jur.,* sec. 1149). But in either case its effect must be to completely divest the donor of any dominion or control over it and to transfer such dominion and control to the donee (*Id.; Jones v. Crisp,* 109 Md. 30, 71 A. 515; *Taylor v. Henry,* 48 Md. 550; *Pennington v. Gittings, supra; Hitch v. Davis, supra*), although the fact that the gift is not to become effective until after the donor's death will not affect its validity as a gift *mortis causa. Howard v. Hobbs,* 125 Md. 645, 94 A. 318.

To be valid, a constructive delivery must not only be accompanied by words sufficient to show a donative intent, but must be of such a character as to completely divest the donor of dominion and control over the donation and to place it "wholly under the donee's power" (*Pomeroy, Eq. Jur.,* sec. 1149), as where the donor gave to the donee a sealed package informing him that it contained bank books, money (*Turner v. Estabrook,* 129 Mass. 425); an insurance policy (*First*

*Nat. Bank v. Thomas,* 151 Md. 250, 134 A. 210); the key to a trunk (*Jones v. Selby,* Prec. Ch. 289; *Coleman v. Parker,* 114 Mass. 30; *Cooper v. Burr,* 45 Barb. (N. Y.) 9); the key to a safe deposit box accompanied by an order for its delivery (*Phipard v. Phipard,* 55 Hun. 433, 8 N. Y. S. 728; *Thomas' Admr. v. Lewis,* 89 Va. 1, 15 S. E. 389); the key to a cupboard (*Goulding v. Horbury,* 85 Me. 227, 27 A. 127); a trunk, box, or other receptacle containing a savings bank deposit passbook. *Vandermark v. Vandermark,* 55 How. Prac. (N. Y.) 408; *Turner v. Estabrook, supra.* Other cases illustrating the application of the rule may be found collected in the notes to *Pomeroy, Eq. Jur.,* sec. 1149; 18 *L. R. A.* 170; 40 *A. L. R.* 1255. The rule as thus stated is subject to this qualification, that, while the delivery may be constructive, "it must be as nearly perfect and complete as the nature of the property and the attendant circumstances and conditions will permit" (28 *C. J.* 692), and many of the cases in which the courts have held a constructive delivery insufficient turn upon that qualification.

The apparent weight of authority is opposed to the doctrine that a sufficient constructive delivery may be effected by "a mere symbolic act (*Pomeroy, Eq. Jur.,* sec. 1149; *Apache State Bank v. Daniels,* 32 Okl. 121, 121 P. 237; *Thomas' Admr. v. Lewis,* 89 Va. 1, 15 S. E. 389; 12 *R. C. L.* 934; 28 *C. J.* 692), but there is respectable authority to the contrary (*Id.*), and the difficulty of the question is indicated by the cautious and qualified statement of the rule by the text-writers. An interesting and instructive discussion of the question is found in *Apache State Bank v. Daniels,* 32 Okl. 121, 121 P. 237, where it was held that the delivery of one of two keys to a safe deposit box by a husband to his wife, the other being in her possession, with donative words indicating an intention to give her the contents of the box, was not a sufficient delivery, but the wife did not take manual possession of the contents of the box during her husband's life. The court in that case stated that its conclusion was influenced by the policy of the state, as expressed in its statutes relating to the testamentary disposition of property,

and, while not directly so stated, it may be inferred that it turned on the fact that the box was accessible and might have been secured and delivered manually without unreasonable inconvenience. That case is opposed to *Thomas' Admr. v. Lewis*, 89 Va. 1, 15 S. E. 389, where the donor on his death-bed gave to the donee a key to a safe deposit box and said, "These keys I now give you whatever you find you can have—it is yours," and directed her to place the keys in her trunk and lock it, which she did. Those facts were held sufficient to constitute a delivery.

Turning to the facts of the present case, it is obvious that the delivery of the bank book to the complainant was more than merely symbolic. The book itself was contained in a suitcase, but the suitcase was in the immediate presence of the donor; he described it, told the donee that "everything in there, all except the insurance policy, is yours," told her where the key to it was, and told her to get it. He could, it is true, have himself manually taken the book from the suitcase and presented it to the donee, but neither law nor reason requires so narrow and limited a construction of the word "delivery" as to require that, and in our opinion his language and conduct at the time Mrs. Mitchell took possession of the suitcase, when considered in connection with his declarations both before and after that event indicating an intent consistent therewith, were sufficient proof of delivery. *Debinson v. Emmons,* 158 Mass. 592, 33 N. E. 706; *Coleman v. Parker,* 114 Mass. 33; *Goulding v. Horbury,* 85 Me. 227, 27 A. 127. For, while such claims are always a subject of suspicion because of the ease and safety with which evidence may be fabricated to show gifts by persons no longer able to speak themselves, and who at the time of delivery were stricken by a mortal and disabling disease, yet that consideration is not an absolute and arbitrary bar, but rather a circumstance to be considered in connection with all other relevant facts in weighing the evidence in a given case.

Assuming therefore that there was a sufficient delivery of the bank book, the remaining question is whether that was a delivery of the fund of which the book was evidence.

The earliest Maryland case dealing with that precise point is *Murray v. Cannon,* 41 Md. 476. In that case it appeared that there was deposited in a savings bank a fund to the credit of "James Cannon, subject to his order, or to the order of Mary E. Cannon." In some way not indicated in the opinion, the passbook showing that deposit came into the possession of Mary E. Murray, the Mary E. Cannon referred to in the account, who had been until his death the agent of the alleged donor, and she claimed the deposit as a gift. It was held upon those facts, upon the authority of *Ward v. Turner,* 2 Ves. Sr. 431, that the delivery of the book of deposit was not a delivery of the money. The case is unsatisfactory as a precedent for several reasons, first, because the conditions upon which the reasoning in *Ward v. Turner* was based no longer exist; second, because the mere delivery of the bank book to Mary E. Cannon was not in itself evidence of a donative intent because she was the agent of the depositor; and, third, because the circumstances under which she came into possession of the book are not referred to in the opinion.

In *Ward v. Turner, supra,* it appeared that William Fly had given to John Moseley three receipts for certain annuities and at the same time indicated that he intended Moseley to use them after he (Fly) was dead. The Chancellor, Lord Hardwicke, who sat in that case, had also decided the case of *Bailey v. Snelgrove,* 3 Atk. 214, where he had held that a bond given in prospect of death could be delivered as a gift *mortis causa.* In *Ward v. Turner* he held that delivery of the receipts did not operate as a delivery of the annuities, and distinguished that case from *Bailey v. Snelgrove* on the ground that, as the law then stood, delivery of the bond to the donee put it in his power to destroy the obligee's right of action on it by depriving him of the power to make *profert in cur.,* whereas the possession of the receipts by Moseley did not completely deprive Fly of dominion and control over the annuities.

The vital and the important thing decided by *Ward v. Turner* was that there could be no valid delivery of a gift

*mortis causa* unless there was an actual tradition of it, or of some token or evidence thereof, the loss of which completely deprived the donor of any control over it, as in *Bailey v. Snelgrove, supra,* where the delivery of the bond made it impossible for the donor to enforce his rights under it so long as it remained in the possession of the donee.

That principle is recognized in the *Restatement of the Law of Contracts,* A. L. I., sec. 158, where it is said: "(1) The right acquired by the assignee under a gratuitous assignment is revocable by the assignor's death, by a subsequent assignment by the assignor, or by notice from the assignor received by the assignee or by obligor, unless, * * * the assigned right is evidenced by a tangible token or writing, the surrender of which is required by the obligor's contract for its enforcement and this token or writing is delivered to the assignee." In the illustrative note to that section it is said: "A delivers gratuitously to B a savings bank book, a non-negotiable promissory note, a non-negotiable bond, a life insurance policy, and a certificate of stock with the expressed intent of making B the owner of the rights of. which these documents are evidence. Such delivery operates as an irrevocable effective assignment of the rights as well as of the documents."

That section is the text of an exhaustive and elaborate article appearing in *Yale Law Journal,* vol, 39, page 771, by Paul W. Bruton, in which the development of the law of gifts following *Ward v. Turner, supra,* is traced. In it the author points out that by the early law no chose in action was assignable, and that the doctrine of delivery was first worked out with reference to the transfer of tangible chattels, that Lord Hardwicke in *Ward v. Turner,* in considering how far the new law permitting assignments of choses in action was affected by the old law relating to delivery, first formulated the doctrine that delivery in the sense of transfer of control was as essential to gifts of choses in action as in gifts of tangible property, and to that extent the law as stated in *Ward v. Turner* is the law of this state today.

The question remains whether the delivery of a savings bank passbook completely transfers the control of the deposit from the donor to the donee. As to that, as to other phases of this difficult and troublesome subject, there is some conflict of authority, and the only case directly in point in this state points the other way. *Murray v. Cannon, supra.* In that case the court laid great stress upon the fact that the supposed donee was, as to the deposit, the agent of the donor until his death, but it did hold that delivery to her of the "book of deposit" did not operate as a transfer of the deposit itself. No reason was assigned for that conclusion other than the decision in *Ward v. Turner, supra.* But, as has been pointed out, that case, with *Bailey v. Snelgrove, supra,* did not support but was opposed to the conclusion in *Murray v. Cannon, supra,* for it was held in the former cases that the actual tradition of some token or evidence of a gift, the loss of which would deprive the donor of any control over the gift, was a sufficient delivery. And the loss of a savings bank passbook would deprive the donor of any control over the deposit evidenced by it quite as effectually as the loss of the bond in *Bailey v. Snelgrove* deprived the donor in that case of control over his rights by the obligor.

In *Pennington v. Gittings,* 2 G. & J. 208, it was held that the delivery of a certificate for stock, signed in blank by the donor, to his son with the intention of making a gift of it to him, was not a valid delivery, because by the terms of the certificate no transfer would be complete unless made at the bank. But in *Dougherty v. Moore,* 71 Md. 248, 18 A. 35, 36, the court considered the question as to whether money on deposit in a savings bank could be the subject of a gift without actual delivery still open, for it said: "We shall not stop to consider whether an assignment in writing and delivery to a donee of a pass-book of a savings bank by the donor, with the intention to give and vest in the donee the immediate right and interest in the money held on deposit, will constitute a valid gift of such deposits. In some states it has been held that such an assignment and delivery will vest in the donee a valid title to the money. It is sufficient to say

there was no delivery by the husband to the wife of the pass-book of the bank in this case, with the intention on his part of renouncing all interest in the deposits, and of transferring to her the absolute title to the same."

In *Whalen v. Milholland,* 89 Md. 206, 43 A. 45, 46, it was shown that Elizabeth O'Neill deposited in a savings bank a fund which was entered as the account of "Elizabeth O'Neill and Mary Whalen. Joint Owners. Payable to the order of either, or the survivor." At Miss O'Neill's death Mrs. Whalen claimed that Miss O'Neill had delivered the passbook to her a few hours before her death, and she claimed the fund as a gift. Referring to that contention, the court said: "The delivery to and acceptance by her of this book as a gift, if in point of fact there was such a delivery and acceptance, clothed her with complete dominion over the money, even as against Miss O'Neill, and of course, there-fore, as against the latter's personal representatives, and left nothing further to be done to consummate the donation. The entry in the book placed the fund to her credit jointly with her sister, though vesting no interest in her, but the owner-ship of the book by gift conferred upon her authority to draw the whole fund for her own use; thus differing radically from *Cannon's* case and *Snowden's* case. * * * A savings bank book has a peculiar character. It is not a mere pass-book, or the statement of an account. It is issued to the person in whose name the deposit is made, and with whom the bank has made its contract. It is his voucher, and the only security he has, as evidence of his debt. The book is the instrument by which alone the money can be obtained, and its possession is thus some evidence of title in the person presenting it at the bank." But it limited that statement to cases in which the entry in the passbook is the same as in the book involved in that case. In *Brewer v. Bowersox,* 92 Md. 570, 48 A. 1060, 1062, where the question was the delivery *vel non* of a certificate of deposit, the court said: "A delivery of the bank book or of the certificate of deposit with an intent to pass the ownership of the fund will perfect the gift, and clothe the donee with an indefeasible right to the money on

deposit. *Whalen v. Milholland, supra.*" And in *Frentz v. Schwarze,* 122 Md. 12, 89 A. 439, the court, following the intimation in *Dougherty v. Moore, supra,* distinguished *Conser v. Snowden,* 54 Md. 175, on the ground that, while in that case the donee had received a written order for the payment of the money, the passbook did not come into his possession until after the donor's death, and held that the transfer of the book, the signing of an order declaring the donor's intent to vest the ownership of the fund in the donee, and the execution of an order on the bank for the payment of the money to a designated person with a view of having the fund placed to the donee's credit, was a sufficient delivery. And in the recent case of *First National Bank v. Thomas,* 151 Md. 248, 134 A. 210, 213, Judge Pattison, speaking for the court, in an opinion which decided that the parol delivery of a life insurance policy with an intention to vest the title in the donee was sufficient, said: "Whether there can be a valid equitable assignment of a policy of insurance, not in writing, but by parol agreement accompanied by delivery and surrender of all control and dominion of it, with the intention of the assignor to divest himself of all interest therein, has not been decided in this state, nor are the authorities elsewhere in accord upon this question, though the great weight of authority is to the effect that such an assignment can be lawfully made."

It is apparent from an examination of those cases that the uniform policy of this court, in applying the doctrine of constructive delivery to gifts, whether *mortis causa* or *inter vivos,* has been to adhere to the rule as stated in *Bailey v. Snelgrove, supra,* and *Ward v. Turner, supra,* rather than to the construction placed upon those cases in *Murray v. Cannon, supra,* and this case cannot upon principle be distinguished from *First National Bank v. Thomas, supra,* except possibly on the ground that by its by-laws the consent of the bank was required. But that by-law could not possibly have been intended to deprive the depositor of the right to dispose of his own property, nor to make his control of it dependent upon the will of the bank, but was obviously intended

to protect the bank against false, fraudulent, or unauthorized claims against said deposit by imposters or others having no title thereto.

It follows that, upon the facts of this case, the delivery of the savings bank deposit book to the appellee, taken in connection with statements made by the donor at the time of delivery, and before and after that event, indicating his intention of giving to her the fund of which the book was evidence, was a valid gift *mortis causa* of that fund. That conclusion is not only consistent with the recent decisions of this court, but with the very decided weight of authority elsewhere. *Snidow v. Brotherton,* 140 Va. 187, 124 S. E. 182. The decree appealed from will therefore be affirmed.

*Decree, affirmed, with costs.*