DANIEL GARNER ET AL. *v.* AUGUSTA GARNER ET AL.

[No. 83, October Term, 1937.]

*Decided February 12th, 1937.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, and SHEHAN, JJ.

*Philip B. Perlman* and *Wirt A. Duvall, Jr.*, with whom were *Joseph L. Bailey, J. Edgar Harvey*, and *Harrington & Harrington*, on the brief, for the appellants.

*V. Calvin Trice* and *Raphael Walter*, with whom were *John R. Pattison, Joseph Stein*, and *Nyburg, Goldman & Walter*, on the brief, for the appellees.

SHEHAN, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Dorchester County dismissing a bill of complaint filed by Daniel Garner, Emanuel Garner, Meyer E. Garner, and Esther Garner Levy, appellants, and next of kin of Isaac Garner, deceased, against Augusta Garner, his widow, individually and as executrix of his alleged last will, and Emerson C. Harrington, Jr., and V. Calvin Trice, administrators *ad colligendum* of the estate of the deceased.

Three questions are here presented:

First. The existence of a constructive trust *ex maleficio*, resulting from the alleged fraudulent procuring of

a paper writing in the form of a last will and testament, dated February 23rd, 1933, under the terms of which all the property of Isaac Garner was given, devised, or bequeathed unto his wife, Augusta Garner.

Second. The existence *vel non* of a gift *causa mortis* from the deceased unto his brother, Daniel Garner, for the benefit of the wife of the deceased, Augusta Garner, and the next of kin, thereby curtailing the operation and effect of said alleged will.

Third. Error in refusal to admit testimony of Daniel Garner in relation to the alleged gift *causa mortis*.

Isaac Garner, with the assistance of his wife, had accumulated a substantial fortune of approximately $400,000, through untiring thrift and rigid economy covering a long period of years. He died on May 29th, 1932, without children, but leaving surviving him his widow, Augusta Garner, a brother, Daniel Garner, and Emanuel Garner, Meyer E. Garner, and Esther Garner Levy, children of Joseph Garner, a deceased brother. Approximately his entire estate, consisting of stocks, bonds, and securities, was found in his lock box in the Mercantile Trust Company of Baltimore City. In addition to these there were accounts of deposit in his name and in the name of his wife.

The first two questions present issues of fact relating to the circumstances surrounding the making of said alleged will, and of the gift *causa mortis*. In the testimony there is much contradiction, conflict of testimony, charges of bad faith, and imputations of sordid designs and practices, which make it difficult to arrive at satisfactory conclusions.

We are not passing upon the wisdom and justice of the disposition of the property of Isaac Garner. That may properly be among the facts to be taken into consideration in deciding the questions involved. Ordinarily, a rational man may be presumed to dispose of his estate according to the usual concepts of duty and the known disposition of people to favor those who are nearest to them and who ordinarily have the first claim upon their

bounty, but in a contrary settlement of property, made deliberately without restraint by a rational person, courts cannot intervene to make a will or dictate dispositions of estates. It might seem just for Isaac Garner to have given something to his brother Daniel, with whom he had worked and been associated, as a near relative and helpful friend, for many years. They had peddled together through parts of this state, one with his pack of merchandise and notions and the other with his tinware. As to the deceased brother Joseph or his children, there is no appearance of ill will on their part, or on the part of Isaac Garner towards them. There is no suggestion of misconduct, unfriendliness, or neglect, and to so dispose of his property that his wife and his wife's relatives, after a few years, will receive all of it, may seem unjust, but that, in itself, is not our problem. Augusta, the widow, is over seventy years of age. She has brothers and sisters living, and upon her death they or their descendants will probably come into possession of such part of the estate as remains in her at the time of her decease.

There are facts to be taken into account in weighing the testimony and in the final decision of the case.

Isaac Garner made a will on January 3rd, 1919, about fourteen years before his death, leaving all of his property to his wife, and named her as executrix. The will of February 23rd, 1933, is exactly the same in language and effect as the first will. There is no question raised as to the legality of the first will, but the validity of the second will is questioned and will be first considered in this appeal.

The first will stood until February 23rd, 1933, about which time he had become seriously ill, and evidently his mind turned sharply toward his business affairs and the ultimate disposition of his property. He became anxious lest the conviction of one of the attesting witnesses to the first will, of a serious criminal offense, might affect its validity; at least this is the reason given by the widow for his making a second will identical in terms, and word

for word an exact copy of the previous will. The appellants contend that there was no reason at all for the execution of the second will in its present form, as a result of such anxiety, because Isaac Garner had inquired of and taken the advice of Abel A. Rosenberg, of the firm of Mackubin, Legg & Company, after Mr. Rosenberg had consulted an attorney. This advice was to the effect that the conviction or imprisonment of an attesting witness to a will did not affect its validity. The testimony on this point is not questioned. The appellants claim that the true reason for Isaac Garner's desiring to make a second will was entirely different from that advanced by his widow. It is alleged in the bill of complaint, and to some extent supported in the testimony, that the deceased had concluded to change his first will, and, after some minor bequests, to so dispose of his property that his brother Daniel and the children of his deceased brother Joseph should receive one half of his estate, and his wife the other half, doubtlessly realizing that under his will, by which his wife received the entire property, her brothers and sisters, or their descendants, would ultimately receive the entire property, to the exclusion of his own near relatives, and this would soon occur, because he was ill, and both he and his wife were far advanced in years. It is charged that, in order to effect this change in the disposition of the property, and not because of any anxiety as to the attestation of his first will, he undertook to decidedly change the disposition of his estate by making another will.

It is alleged that, being seriously ill, Mr. Garner sent his wife to Mr. Walter B. Johnson, cashier of the National Bank of Cambridge, who had drawn the first will, and who had known and had transacted business with Isaac Garner for a long time, with the instructions that he prepare a will carrying out his plans for a new disposition of his estate. It is charged that he directed his wife to instruct Mr. Johnson to prepare a will so that, after certain charitable and religious bequests and other small gifts, his property should be divided, one-

half to his wife and one-fourth to Daniel, and one-fourth to the children of his deceased brother Joseph. It is further charged that, his wife realizing the effect of this change, and knowing that her husband could not read the English language, and in order to trick and defraud her husband into executing a will identical in form and effect with the first will, and not change it as desired by him, so that she would receive practically the entire estate, she requested Mr. Johnson to make an exact copy of the first will, except as to date, the signatures of the said Isaac Garner, and the attesting witnesses. She delivered this will to Mr. Johnson, and explained that her reason for so doing was that her husband might be relieved of his anxiety as to the validity of his first will. As requested, Mr. Johnson caused this copy to be made with care and precision and carried it to Mr. Garner's place of business, and took with him two employees of the bank to attest the will, if it met with his aproval. What then happened is of such importance that the testimony of Mr. Johnson on this question will be here set out:

"I told Mr. Garner that I had the paper I had promised to prepare and the clerks of the bank were across the street; if he wanted to execute the paper, I would call them. He said 'All right.' I went to the door and called the clerks over. After they got there I took the papers out of my pocket. Q. What papers? A. The old will and the will I had just completed. I said, 'Mr. Garner, here is this paper; do you want to read it?' 'No.' 'Do you want to read it?' 'No.' I said, 'Do you know this is your last will and testament that Mrs. Garner asked me to write this morning; being you haven't read it and don't want me to read it, I might state it is identical with the other will; it is the same in every particular; and, as I understand, the only change you wanted to be made in that will was to change the witness—have a witness other than Mr. Barnett.' He said, 'That is right'."

The proper execution of this paper as a will is not disputed. Unless we entirely ignore Mr. Johnson's testimony,

directly supported as it is by the testimony of Augustus Stewart, another disinterested and credible witness and an employee of the bank of which Mr. Johnson was cashier and Mr. Isaac Garner was a customer, or unless we believe that Isaac Garner did not understand what he was doing or the purport of the will, even though it was carefully explained to him by his friend and adviser, the validity of this will cannot be questioned, either as to its execution or the understanding of its terms by Mr. Garner.

The conflicting stories given by other witnesses as to the statement of Mr. Garner after the will was made present some difficulties, but should not outweigh the testimony of Mr. Johnson and of Mr. Stewart, both business men occupying positions of trust and confidence in the community, with apparently no improper motives or selfish interests to serve, and being only desirous of aiding a friend and customer of the bank in a manner desired by him.

The witnesses whose testimony is to the effect that Augusta Garner tricked her husband into executing a second will, believing that it was a testamentary paper entirely different in its effect from his first will, are in most part interested, and will be denied their expectations with regard to the estate, if the will is sustained and not defeated in its operation by later gifts of his property.

The second question presents a more difficult and interesting problem. Holding that the second will is valid does not dispose of this case. The further question to be decided is whether Isaac Garner, after he had made this will, in the manner and form as shown by Mr. Johnson, did for some reason wish to change the disposition or settlement of his property so that other relatives and charitable institutions would participate in and be the beneficiaries of his bounty, and that certain religious rites be performed, and for that purpose made a gift *causa mortis* to his brother Daniel.

Isaac Garner and his wife were orthodox Jews and were devoted to their faith and religious observances,

and to them he wished to give recognition and substantial assistance. He also desired to compensate a faithful employee and to aid the Cambridge Hospital and other charities. This, it is claimed by the appellants, led him to desire radical changes to be made in his will, in which wish he was suspicious of being frustrated, and, not being able to thus perfect his purpose, he resorted to the plan of making a constructive delivery of the contents of his lock box in the Mercantile Trust Company to his brother, for the same purposes as were planned by him to be effected by a second will. He therefore undertook this by a gift *causa mortis* by delivering the key to the lock box to his brother Daniel.

It is claimed that he twice made this effort, and his desire in that behalf was defeated, in the first instance, by trickery and fraud in the signing of a will, the contents of which he did not know and were contrary to his wishes, and, secondly, by a course of conduct on the part of his wife that he could not control. He endeavored to procure the second will, and his wife refused to deliver it to him, claiming that the will had been lost or mislaid, when in fact it was in the possession of one of her brothers in the City of Washington. There are two reasons which may be assigned for disposing of his property by this gift; the one grows out of the suspicion entertained by him that this second will was not in its terms as he wished, or that he later changed his mind as to the disposition of his property. In purpose and effect the alleged gifts were substantially the same as the bequests he desired to be incorporated in the second will. In each of these intended dispositions, the wife was to receive one-half, his brother Daniel one-fourth, and the children of Joseph one-fourth, after some small gifts or bequests, and Daniel Garner, to whom the key is alleged to have been given, was directed and intrusted to make the division of the contents of the lock box, according to the instructions of Isaac Garner. Thus appears the relationship between this gift and the second will, and how it came

about that the alleged gift was made. These are contentions of the appellants.

Gifts *causa mortis* are always regarded with suspicion, and can only be established by the clearest and most convincing evidence. In regard to such gifts this court has said, in *Brooks v. Mitchell*, 163 Md. 1, at page 13, 161 A. 261, 266; "For, while such claims are always a subject of suspicion because of the ease and safety with which evidence may be fabricated to show gifts by persons no longer able to speak themselves and who at the time of delivery were stricken by a mortal and disabling disease, yet that consideration is not an absolute and arbitrary bar, but rather a circumstance to be considered in connection with all other relevant facts in weighing the evidence in a given case."

On all of the principal allegations in the bill some supporting testimony appears in the record, but there is lacking that degree of clarity and trustworthiness in it required by law. The testimony leaves one in uncertainty and doubt, and, where there is doubt, a gift *causa mortis* must fail. In litigation of this class we are governed by strict rules of evidence, and the clearest proof is required to justify the relief sought. Much of the testimony on both sides does not bear cautious scrutiny or careful analysis.

In the case of *Whalen v. Milholland*, 89 Md. 199, 210, 43 A. 45, 50, this subject is treated with force and precision. It is there aptly said: "These death bed donations, to be upheld, ought to be above question or suspicion at all times, but more especially when they render inoperative, as they would in this case, the provisions of a will made at a calmer and more collected moment. The evidence to support them ought to be clear and free from uncertainty, for the temptation to seize upon disjointed sentences, uttered when the physical frame is prostrated and the mental faculties are failing, and to convert them into a deliberate gift of the bulk of a dying person's estate, might be too often yielded to, under the influence of interest or the promptings of

avarice, and produce most grievous wrongs. The facility with which such gifts sometimes are proved is suggestive of great caution in weighing the evidence adduced to sustain them. To doubt them ought to be to deny them. 'Around every other disposition of the property of the dead the legislature has thrown safeguards against fraud and perjury. Around this mode (*donatio mortis causa*) the requirement of actual delivery is the only substantial protection, and the courts should not weaken it by permitting the substitution of convenient and easily proven devices.' *Keepers v. Fidelity Co.*, 56 N. J. Law, 302, 28 A. 585. Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property asserted to have been made while he was living, it is but a salutary precaution which demands explicit and convincing evidence of every element needed to constitute a valid donation, whether it be a donation *inter vivos* or *mortis causa*. Even then fraudulent claims may prevail, but the rigid requirement of the clearest proof will at least diminish the number."

The testimony should here have some consideration in detail.

The second will was dated February 23rd, 1931, and, as we have observed, this will gave to Mrs. Garner the entire property of the deceased. Nevertheless we find him in March and April, 1933, changing his deposit accounts in the National Bank of Cambridge and the Mercantile Trust Company to his and his wife's joint account, with the right of survivorship. It is claimed that this confirms his intention to give his entire property to his wife, and rebuts the claim that he had intended to make a will giving her but one-half of his estate. On the other hand, it may be argued that he would not have so changed these accounts had he known that the money in these banks would go to her under the provisions of the will as executed.

Further considering the plaintiff's testimony, which

is voluminous and presented in a large record, the witness upon whose testimony the appellants must rely is that of Miss Willey, since married to a Mr. Adams, who is herein referred to as Mrs. Adams. Her testimony is far from being satisfactory or convincing. Her letters written to Mrs. Garner are contradictory and are not in accord with the statements she is shown to have made to a number of witnesses. The important question of how Daniel Garner became possessed of the key to the lock box in the Mercantile Trust Company is surrounded by such contradictory statements that it is impossible to arrive at any conclusions on this point. At one time she stated that Daniel Garner had stolen the key, and at another time there is testimony that she made the statement that she would testify that Isaac Garner in her presence gave the key to his brother Daniel. The letters and her subsequent conduct first show that she had some devotion and loyalty and was giving support to the contentions of Mrs. Garner. Later on she assumed an entirely inconsistent attitude in regard to this matter and testified as the principal witness of the plaintiffs. For such inconsistent statements and vacillating conduct she gave the excuse that she thought Isaac Garner was worth much less than he proved to be. There are other circumstances in connection with the testimony, together with the interest she had in the estate if the second will failed and the gift *causa mortis* was established, and it does not afford to the court the kind of testimony required to sustain a gift of this character. Under the ruling of the chancellor, before whom the testimony was taken in open court, the proposed evidence of Daniel Garner was excluded for the reasons hereinafter stated. Consequently there is no conclusive evidence as to how he became possessed of this key which constituted the constructive delivery of the property in the lock box, and that is a very important question. It is essential to every gift that an actual or constructive delivery be made, and, without clear proof on this point, especially in gifts *causa mortis*, they cannot be sustained. If the

testimony of Mrs. Adams has in it elements of doubt, then the delivery of the key is in doubt, as well as the intention of Isaac Garner to make this gift by constructive delivery for the purposes alleged. In a constructive gift the intent should be clearly shown. *Brooks v. Mitchell*, 163 Md. 1, 161 A. 261.

The long delay of Daniel Garner in asserting the gift, which carried valuable rights to him, is not helpful to his cause. Mrs. Garner in her evidence states that she had the key in her possession on May 30th, 1933, which was the day after the death of Isaac Garner, and on that day, or shortly thereafter, the key disappeared. Mrs. Adams testified that Mr. Garner wore the key about his neck during his last illness, and that Mrs. Garner, when her husband was dying, missed the key and became much concerned, and shook him and tried to make him tell where it was, but later in a letter she asked Mrs. Garner, "Did you find the key to the safety deposit box or did Mr. Garner give it to some one before he died?" This statement does not support Mrs. Adams' testimony, and is also in conflict with her statements that Mr. Garner gave his brother the key in her presence, and that Daniel Garner stole the key. If either one of these statements is true, the statement in the letter is entirely misleading. Mrs. Adams and David I. Jacobson testified that Isaac Garner told them he had given the key to the lock box to Daniel, and had told him what to do in case of his death, but Mrs. Adams told the witness Crane that Mr. Dan Garner had stolen the key, but told the witness Viola McLain that she was going to testify that she was in the room when Isaac Garner gave the key to his brother Dan. We could continue to further discuss this testimony, but it would be to little purpose. The above presents a picture of testimony that is neither clear nor convincing, and it is not that kind of testimony that is required to support a gift *causa mortis*, but it is of the class of testimony against which warning has been given in many cases where a gift *causa mortis* is endeavored to be established. It has been

stated many times that this court will not reverse the lower court upon a finding of facts, especially where testimony is taken in open court, "unless the evidence clearly demonstrates that such finding was erroneous, for the sufficient reason, often stated, that the chancellor has the benefit of seeing and hearing the witnesses, observing their manner of testifying and general demeanor; or, in other words, having the benefit of the atmosphere surrounding the trial." *Sporrer v. Ady*, 150 Md. 60, 132 A. 376, 380, and cases there cited. This rule is especially applicable where testimony is contradictory and uncertain as in the instant case. It may be that this rule is often urged with small reason, but it is difficult to imagine a case in which the rule could be more justly applied than in the instant case. The nature of the case, the character of the testimony, the class of witnesses in most part, the amount involved, the conflicting interests of the parties and of some of the witnesses, are compelling reasons for invoking the rule. In weighing the testimony it would be helpful to actually observe the appearance and general manner, age, and infirmities, the conflicting interests, the partisanship, and the general atmosphere surrounding the trial, remembering the large amount of money involved. This advantage is not given to us but to the chancellor.

The rules laid down in *Whalen v. Milholland, supra,* and in *Brooks v. Mitchell, supra,* are equally applicable and should without hesitation be applied, and the facts weighed and determined in the light of these authorities. Criticism of the same character could be aimed at some of the testimony of the defendant, but on the plaintiffs the burden is heavily laid by the rules of the law above recited. Mrs. Garner's brothers Walsky, with their conviction of crime, assuming control and direction of the business, carrying the second will to Washington, and the denial of Mrs. Garner that she knew where it was, her failure to meet many of the questions presented in the case and to reply to accusations, and other like incidents, are equally questionable, but the burden is not upon the

defendant. It is on the plaintiffs and, as stated in all the authorities, must be discharged by clear, certain, and trustworthy proof.

The conclusion of this court is that the authorities and the evidence do not warrant our holding that a valid gift *causa mortis* of the contents of the lock box was made.

The final question for our consideration is, Should the testimony of Daniel Garner have been admitted as to the transaction with, and statements made to him by, Isaac Garner, with respect to the delivery of the key, and the purposes of the gift.

The Code, art. 35, sec. 3, provides: "In actions or proceedings by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as such * * * no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator, intestate, ancestor or party so incompetent to testify," etc. This statutory rule of evidence has been invoked and applied in many cases, and in no instance has there been a departure from its clear intent and meaning.

When the disability of witnesses to testify in cases in which they have an interest was removed, the Legislature saw fit to make certain reservations and retain some of the restrictions that were formerly imposed. The purpose of this is obvious. The statutory provision above stated was made for the prevention of perjury and fraud, growing out of the interest and cupidity of litigants and the difficulty in refuting such claims.

The reasons underlying the passage of this statute forcefully apply in this case. Here the question is whether by the terms of the act the evidence of Daniel Garner should have been rejected. So far as we can ascertain, this exact point has never been passed upon in this state. Briefly stated, it is this: Can a person to whom an alleged gift *causa mortis* is made be permitted to testify as to the conversation between him and the donor, showing just what the gift was and the terms and conditions thereof, when such donee is a party to the suit, and the executrix of the donor is the other party? We have concluded that

the lower court ruled properly in rejecting the testimony. The authorities in this state support this conclusion, as a brief review will disclose.

Parties to cases against executors or administrators have been held incompetent to testify to transactions with or statements made by decedents, as to services rendered to the deceased in a suit for payment for such services. *Giering v. Sauer,* 120 Md. 295, 297, 87 A. 774. In a suit against an administrator, the plaintiff was held incompetent to prove her marriage to the intestate. *Bowman v. Little* 101 Md. 273, 295, 61 A. 223, 657, 1084. The testimony of the plaintiff, in relation to statements of the deceased that certain deposits to the credit of his wife were made with individual money of the plaintiff, in which the defendant had no interest, was held inadmissible. *Martin v. Munroe,* 121 Md. 679, 684, 89 A. 319. The case of *Farmer v. Farmer,* 137 Md. 69, 72, 111 A. 464, relates to transactions and statements concerning deposits in the name of the deceased. See, also, *Smith v. Humphreys,* 104 Md. 285, 65 A. 57.

In the case of *Chase v. Grey,* 134 Md. 619, 626, 107 A. 537, a party to a cause was held incompetent to testify to transactions with or statements by the decedent respecting gifts or transfer of money and property. This was not a gift *causa mortis,* but here the same reasons apply with greater force than in that case. The analogy of this case to the instant case is clear, and we think controlling.

The question of the right of the court of equity to entertain this bill for the purposes of enforcing this alleged gift *causa mortis* is not here passed upon, because in neither the arguments nor the briefs has this question been raised.

From our opinion on the several questions here presented, it is obvious that the decree in this case must be affirmed.

*Decree affirmed, with costs to be paid by the appellants.*