SCHILLING ET AL. *v.* WALLER

[No. 344, September Term, 1965.]

272

*Decided June 27, 1966.*

*Motion for rehearing filed July 1, 1966, denied July 18, 1966.*

The cause was argued before Prescott, C. J., and Horney, Marbury, Oppenheimer and McWilliams, JJ.

*Joel H. Pachino,* with whom were *Irvin S. Friedman* and *Paul Weinstein* on the brief, for the appellants.

*William A. Hegarty* for the appellee.

Marbury, J., delivered the opinion of the Court.

In April 1963 Charles Waller died intestate and was sur-

vived by a wife, Delia Waller, appellee, as well as seven sisters and one brother. During his life the decedent and his wife rented a safe deposit box from the Mercantile Safe Deposit and Trust Company, of Baltimore, Maryland, to which both had keys and to which each had the right of access independently of the other. At the time of Charles Waller's death the safe deposit box contained: (1) various stock certificates valued at more than $50,000 in eleven different corporations, all of which indicated that Charles Waller was the owner, (2) a savings account passbook in decedent's name, showing a balance of $7500, and (3) a confessed judgment note payable to Charles Waller in the amount of $2500. The above listed three items of assets will hereinafter be referred to as the "contents of the box," although actually the box contained certain other items, not here at issue, which were in the joint names of Charles and Delia Waller.

On January 8, 1964, Delia Waller filed, in the Circuit Court of Baltimore City, a bill of complaint wherein she prayed that the court declare that the contents of the box were solely her property since ownership of these assets had passed to her by virtue of a gift *inter vivos* (alternatively claimed in an amended bill to be a gift *causa mortis*) from the decedent to her.[1] The bill named as defendants the administrator of Charles Waller's estate, as well as the decedent's eight siblings. A hearing was held on this matter before Judge J. Gilbert Prendergast, and in an order dated May 27, 1965, the judge ordered, for reasons set forth in an earlier memorandum, that the administrator turn over the contents of the box, as well as the proceeds from the collection of the confessed judgment note to Delia Waller. The decedent's brother and seven sisters, then instituted this appeal. At issue is whether the plaintiff-appellee had presented evidence sufficiently clear to prove that the deceased had in-

---

1. Mrs. Waller also prayed, in the alternative, that the safe deposit box's contents be declared her property since the assets had been held by the deceased for the use and benefit of her and that these assets had resulted from monies advanced by her during his lifetime to be held in trust for her. Plaintiff-appellee's counsel admitted at the close of the hearing that there was no evidence to support this theory and resultantly the trial judge dismissed that portion of the bill for declaratory relief.

tended to make a gift *inter vivos* of the contents of the safe deposit box.

The following undisputed facts were disclosed at the hearing: The decedent and Delia Waller had been married in 1929 and the marriage had been an harmonious one. During the latter part of their married life the couple had lived, rent free, in a house owned by Mrs. Selma Coplin, a sister of the plaintiff-appellee. The decedent had no animosity toward, but very little contact with, his brother and sisters during his married life. On March 30, 1963, Charles Waller, age seventy-five, entered the University of Maryland Hospital, after having complained of incomplete digestion and nausea. On April 12, 1963, Mr. Waller was moved to the surgical ward of the hospital in anticipation of an exploratory operation expected to be performed three days later, but the operation was not performed because of the patient's death on April 13, 1963. An autopsy revealed that he suffered from carcinoma (cancer) of the stomach and arteriosclerotic heart disease.

Selma Coplin, who was called on behalf of her sister, the plaintiff-appellee, testified at the hearing that she and Delia Waller paid a visit to the hospital room of Mr. Waller on April 10, 1963. During his entire stay in the hospital, Mrs. Coplin testified, the patient talked about and was actively interested in the stock market. On this particular visit Mr. Waller was said to be in very jovial spirits and at one point an agent of a television rental service came to collect the rent for a set used in the hospital room. Mr. Waller was sitting on the edge of his bed at this time and asked Mrs. Coplin to get his checkbook out of a nearby cupboard so he could pay the bill, and he also said to her: "While you're here, would you please go get my wallet." This was done, and after the collector had left, Mrs. Coplin testified, on direct examination, that Mr. Waller then withdrew from his wallet a key to the safe deposit box here in question, and said to his wife:

> "Delia, I want you to have the safe deposit key, you have one but I want you to have mine and I want you to have everything that is in the safe deposit box."

She further testified that Mr. Waller then gave the key to his wife.

On cross examination of Mrs. Coplin the following colloquy took place:

"Q. Indeed, you have read this deposition before you came to Court, is that correct? A. Yes.

Q. I am questioning you from that deposition and in that deposition, starting on Page 14, Mr. Pachino [one of defendant-appellants' other attorneys] asked you the following question and you then gave the following answer. I will read the complete question and answer to you. 'Question. Then you heard, as I recall, the conversation that you and I had together, in which Charles said to Delia, "You have your key, I want you to have mine, you will have to take care of the purse strings for awhile, take what you want," is that correct?'

Then your answer: 'Answer. Yes, he says take everything you want [that] I have there, he said, because I won't be able to take care of things and I want you to have what is in there.'

Q. Is that correct? A. Definitely.

Q. Did he say that he wanted Mrs. Waller to take care of the purse strings for awhile? A. He said, 'I want you to take care of things, I want you to have everything that's in the box.'

Q. Did he say, 'I want you to take care of the purse strings for awhile?' A. He said, *I want you to take care of the purse strings and I want you to have everything that's in the box.*

Q. Did he say, 'I want you to take care of the purse strings for awhile?'

(Mr. Hegarty) : I object.

(The Court) : Overruled. She has already said that as well as certain other things, is that correct?

(The witness) : Yes. He said, 'I want you to have everything that's in the box, and you will have to take care of the purse strings *for awhile.*'

Q. Well, is the question and answer as I have read them to you, a true and correct statement of what was said in the room in the hospital that day? A. Yes."
(Emphasis added.)

At the hearing, the widow, Delia Waller testified that: Selma Coplin was present with her in the hospital room of her husband on April 10, 1963; a "T.V. man" was paid on that particular afternoon; Mrs. Coplin had been asked to get a checkbook from the cupboard; Mrs. Coplin was still present after the "T.V. man" left; and that her husband had made certain statements to her with reference to the key to the safe deposit box. She was properly not allowed to testify as to statements made to her in regard to the key because of Code (1965 Replacement Vol.), Article 35, Section 3, commonly referred to as the "Dead Man's Statute," which prohibits (with certain exceptions not here relevant) party witnesses from testifying as to transactions with the intestate.

There was no evidence, one way or the other, that at the time of the alleged gift (April 10, 1963) the decedent knew about the exploratory operation which was, on April 12 at least, scheduled for April 15. Moreover, there was presented no other evidence from which it could be found that the intestate thought that the end of his life was near. Thus, this alleged gift, if it can be held to stand, must be a gift *inter vivos*.

In the case of *Whalen v. Milholland,* 89 Md. 199, 211, 43 Atl. 45, 50, our predecessors used the following language, which is also apposite here:

> "Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property asserted to have been made whilst he was living, it is but a salutary precaution which demands *explicit and convincing* evidence of *every element* needed to constitute a valid donation whether it be a donation *inter vivos* or *mortis causa.* Even then, fraudulent claims may prevail, but the *rigid requirement* of the *clearest proof* will at least diminish the number." (Emphasis added.)

See also *Schenker v. Moodhe,* 175 Md. 193, 197, 200 Atl. 727, and *Garner v. Garner,* 171 Md. 603, 612, 190 Atl. 243, where the above language was quoted with approval. One of the elements of a valid gift *inter vivos* is, of course, that the donor intended to make a gift. In this State it is well settled that in

order for such an intent to be proven, it must be shown from the evidence that the donor *clearly* and *unmistakably* intended to *permanently* relinquish all interest in, and all control over the *res* which is the subject of the gift. *Berman v. Leckner,* 193 Md. 177, 66 A. 2d 392; *Long v. Huseman,* 186 Md. 495, 505, 47 A. 2d 75; *Beard v. Beard,* 185 Md. 178, 186, 44 A. 2d 469; *Schenker v. Moodhe, supra; Hutson v. Hutson,* 168 Md. 182, 189, 177 Atl. 177; *First Nat. Bank v. Thomas,* 151 Md. 241, 134 Atl. 210; *Whalen v. Milholland, supra; Dougherty v. Moore,* 71 Md. 248, 18 Atl. 35; *Gardner v. Merritt,* 32 Md. 78, 3 Am Rep 115. See also 24 Am. Jur., *Gifts,* Section 21, pp. 725, 739; and 38 C.J.S., *Gifts,* Section 15, pp. 790-92. In the instant case we do not think the evidence here presented meets the above test of proof sufficient to show intent to make a gift *inter vivos.*

In arriving at the above conclusion we do not presume to judge the credibility of Selma Coplin, the only witness who testified as to this transaction. Judgments of a witness' credibility are best made by the trier of the facts below and not by us on appeal. But when all of this testimony, concerning Mrs. Coplin's recollection of the conversation which the intestate had with his wife, is read together, we are left with grave doubts as to whether Mr. Waller actually intended that his wife should become the sole and exclusive owner of the property, or whether he intended her to be his agent in regard to the property contained in the safe deposit box.

It may be true, as pointed out by the plaintiff-appellee in her brief, that if we focus exclusively on Mrs. Coplin's testimony on direct examination, then the words allegedly used by Mr. Waller, accompanied by the handing over of the key, might amount to clear, unmistakable, and thus legally sufficient evidence of his intent to transfer the ownership of the contents of the safe deposit box to his wife. However, a dark shadow is cast over the subject of the intestate's actual intent by Mrs. Coplin's later and further recollection, brought out on cross examination, of other words used by Mr. Waller at the time when this transfer of the key was made.

If Mr. Waller said to his wife, as Mrs. Coplin recalled at one point of the cross-examination that he did, "I want you

to have everything that's in the box, and you will have to take care of the purse strings for a while," then his intent in regard to the contents of the box is far from *clear* and *unmistakable*. Admittedly, he might have meant by these words that he was irrevocably giving to his wife all that was in the safe deposit box and was, apart from that gift, informing her that it would be temporarily necessary for her to manage their joint monetary affairs. An equally plausible explanation of the idea which he wished to be conveyed by the words "take care of the purse strings for a while" is that he wished his wife to take care of *his* personal monetary affairs while he was ill. If the latter be the case, then it is extremely likely that he meant the "purse strings" language to relate to the statement "I want you to have everything in the box" because approximately ninety-five per-cent of his assets were contained in that box and she could scarcely take care of *his* monetary affairs unless she had tempo-rary control over the assets contained therein. In short, he might well have intended from the words used that his wife was to be his agent in the handling of all of his assets, including those contained in the box.

While many cases have held that the handing over of a key to a receptacle, under certain circumstances, is sufficient evi-dence of constructive delivery of the contents thereof (see An-not. 127 A.L.R. 780, 781, *Gift — Delivery of Key to Recep-tacle*), mere delivery of the key does not necessarily indicate an intent to part permanently with control over its contents. Under the circumstances of the instant case the key transfer was a matter of some ambiguity, since it could be said to show that he was symbolically delivering the contents of the box to his wife, as well as manifesting an intent to permanently re-linquish control over those contents, or it could have been in-tended to mean that he merely wished to place the key in trust-worthy hands for safekeeping during his stay in the hospital. Cf. *Kling v. McCabe,* 36 F. 2d 337, 341 (8th Cir.). Indeed, the latter interpretation has much to commend it when taken with the fact that the key's delivery was apparently made syn-chronously with the statement that the wife would have to "take care of the purse strings for a while," inasmuch as ninety-five per cent of his "purse" was in the box it would be reasonable

for him to think that such a caretaker should have both keys thereto.

If an alleged donor dies soon after an asserted gift *inter vivos* has been made, the courts should weigh with great caution the evidence produced to show every element of such a gift, since the "donor" is no longer present and there exists a great temptation to seize upon a portion of a disjointed sentence, or words used out of context, so that a gift of a part of a deceased's estate may be disposed of with relatively few safeguards. *Whalen v. Milholland, supra,* at pages 210-11. Exercising such caution we are constrained to hold that the evidence here presented did not clearly and explicitly show an unmistakable intent on the part of Mr. Waller to permanently relinquish all ownership and control over the contents of the box and thus the alleged gift must fail.

We conclude that the chancellor erred in ordering the administrator to turn over the contents of the box, as well as the proceeds from the collection of the confessed judgment note to Delia Waller, so that the order of May 27, 1965, must be reversed and the case remanded for the passage of an order to the end that the property in controversy be turned over to the administrator, who shall account for the same in the estate of Charles Waller, deceased.

In view of what we have said above we do not reach the appellant's second contention which is that there was an insufficient delivery of the stock certificates due to the fact that the certificates did not bear the "donor's" endorsement, or its equivalent, and were not transferred to the alleged donee on the books of the corporations.

*Order reversed and case remanded for passage of an order in accordance with this opinion. Costs to be paid by appellee.*